**AMNESTY INTERNATIONAL USA, Center for Constitutional Rights, Inc., & Washington Square Legal Services, Inc., Plaintiffs,**

v.

**CENTRAL INTELLIGENCE AGENCY, Department of Defense, Department of Homeland Security, Department of Justice, Department of State, and Their Components, Defendants.**

No. 07 Civ. 5435 (LAP).

United States District Court, S.D. New York.

Aug. 2, 2010.

David Seaton Brown, Madeleine Ann Hensler, Morrison & Foerster LLP, Margaret Lockwood Satterthwaite, Amna Amber Akbar, New York University School of Law, Gitanjali S. Gutierrez, New York, NY, for Plaintiff.

Jeannette Anne Vargas, Brian Marc Feldman, Emily Ewell Daughtry, Heather Kirsten McShain, U.S. Attorney's Office, New York, NY, for Defendant.

## OPINION AND ORDER

LORETTA A. PRESKA, Chief Judge.

Plaintiffs Amnesty International USA ("AI"), the Center for Constitutional Rights, Inc. ("CCR"), and Washington Square Legal Services ("WSLS," and together with AI and CCR, "Plaintiffs") served four requests for records (the "Requests") under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, on Defendant Central Intelligence Agency ("CIA" or "Defendant").[1] Currently before the Court are the CIA's motion for

---

1. Plaintiffs served FOIA requests on the other Defendants, but those requests are not the subject of the current cross-motions.

summary judgment [dkt. no. 141] and Plaintiffs' cross-motion for partial summary judgment [dkt. no. 158] which raise the questions of whether the CIA adequately searched for the requested records and properly invoked several of the exemptions set forth in the 5 U.S.C. § 552(b).[2] For the reasons set forth herein, the Court concludes that the CIA's search for responsive records was adequate, except for its search for records relating to the CIA's use of the "attention grasp" technique in its interrogations of suspected terrorists. In addition, the Court finds that the CIA's assertion of the various FOIA Exemptions and its Glomar responses are, for the most part, justified. Accordingly, the CIA's motion and Plaintiff's cross-motion are GRANTED in part and DENIED in part.

## I. *BACKGROUND*

### A. *The Requests*

Collectively, Plaintiffs have submitted four FOIA requests to the CIA and other agencies seeking records relating to the detention and treatment of detainees. The specifics of each request will be discussed in turn.

#### i. *The CCR FOIA Request*

On December 21, 2004, CCR submitted a FOIA request for "records relating to the identity of, transport and location(s) of, authority over, and treatment of all unregistered, CIA, and 'ghost' Detainees interdicted, interrogated, and detained by any agency or department of the United States." (Hilton Decl., Ex. B and Brown Decl., Ex. A ("CCR FOIA Request") at 3.) The CCR FOIA Request contained seventeen separate record requests which sought:

1. All records that propose, authorize, report on, or describe, or that discuss the legality or appropriateness of holding Unregistered, CIA, and/or "Ghost" Detainees in special CIA or other agency facilities for purposes of interrogation.

---

2. The parties have filed the following briefs: Memorandum of Law in Support of the Central Intelligence Agency's Motion for Summary Judgment ("Def. Mem."); Memorandum of Law in Support of Plaintiffs' Cross–Motion for Partial Summary Judgment and in Opposition to Motion for Summary Judgment by the Central Intelligence Agency ("Pl. Mem."); Reply Memorandum of Law in Further Support of the central Intelligence Agency's Motion for Summary Judgment and in Opposition to Plaintiffs' Cross–Motion for Summary Judgment ("Def. Reply"); Reply Memorandum of Law in Further Support of Plaintiffs' Cross–Motion for Partial Summary Judgment and in Opposition to Motion for Summary Judgment by the Central Intelligence Agency ("Pl. Reply"). In addition, the parties have filed several declarations in support of their motions, including: Declaration of David J. Barron, dated September 22, 2009 ("Barron Decl."); Declaration of Margaret P. Grafeld, dated September 18, 2009 ("Grafeld Decl."); Declaration of John F. Hackett, dated September 22, 2009 ("Hackett Decl."); Declaration of Karen L. Hecker, dated September 18, 2009 ("Hecker Decl."); Declaration of Mark Herrington, dated September 22, 2009 ("Herrington Decl."); Declaration of Wendy M. Hilton, dated September 18, 2009 ("Hilton Decl."); Second Declaration of Wendy M. Hilton, dated February 26, 2010 ("Second Hilton Decl."); Declaration of James P. Hogan, dated September 21, 2009 ("Hogan Decl."); Declaration of Philip J. McGuire ("McGuire Decl."); Margaret P. Grafeld, dated September 21, 2009 ("Grafeld Decl."); Declaration of Dione Jackson Stearns, dated September 22, 2009 ("Stearns Decl."); Declaration of Jeannette A. Vargas, dated September 22, 2009 ("Vargas Decl."); Supplemental Declaration of Jeannette A. Vargas, dated March 5, 2010 ("Supp. Vargas Decl."); Declaration of William K. Lietzau, dated March 5, 2010 ("Lietzau Decl."); Declaration of David S. Brown, dated November 20, 2009 ("Brown Decl."); Supplemental Declaration of David S. Brown, dated May 7, 2010 ("Supp. Brown Decl."); Declaration of Margaret L. Satterthwaite, dated November 20, 2009 ("Satterthwaite Decl.").

2. All records that discuss the creation, use and/or closure of the various centers at which the CIA and/or any other agency of the federal government has held, and/or continues to hold Unregistered, CIA, and/or "Ghost" Detainees.

3. All records reflecting the use of any private companies, other U.S. officials or citizens, and/or officials or citizens of any foreign governments regarding the interdiction, arrest, transfer, detention, questioning, interrogation, and/or other treatment of any Unregistered, CIA, or "Ghost" Detainee[.]

4. All records reflecting standards or policies governing who may be held as an Unregistered, CIA, and/or "Ghost" Detainee and what procedural protections or guidelines, if any, are used to review the arrest, detention, and treatment of these Detainees.

5. Every location from September 11, 2001 to the present at which the CIA or any other governmental agency has been or is now holding Unregistered, CIA, or "Ghost" Detainees, the dates of operation of each such facility, whether the facility remains open at this time, the purpose of the facility, a complete list of the Detainees held at the facility (both past and current with indications as to this status), a list of techniques used for interrogation at each facility, and a list of personnel who have worked and those who continue to work at each Center.

6. All records concerning the treatment of the Unregistered Detainees held in any CIA or other governmental facility in the world. Please include all records discussing the following interrogation methods at such facilities, including but not limited to records discussing their legality or appropriateness: using "stress and duress" techniques on Detainees; using force against them; subjecting them to physical injury; requiring them to stand or kneel for prolonged periods; depriving them of sleep, food or water; holding them in awkward and painful positions for prolonged periods; denying them painkillers or medical treatment; administering or threatening to administer mind altering substances, "truth serums" or procedures calculated to disrupt the senses or personality; subjecting them to prolonged interrogation under bright lights; requiring them to be hooded, stripped, or blindfolded; binding their hands and feet for prolonged periods of time; isolating them for prolonged periods of time; subjecting them to violent shaking; subjecting them to intense noise; subjecting them to heat or cold; or threatening harm to them or other individuals.

7. All records setting forth or discussing policies, procedures or guidelines relating to the detention, questioning, interrogation, transfer, and treatment (including, but not limited to the interrogation with use of torture or other cruel, inhuman or degrading treatment or punishment) of the Unregistered, CIA, and/or "Ghost" Detainees, including but not limited to policies, procedures or guidelines relating to the methods listed above.

8. All records relating to measures taken, or policies, procedures or guidelines put in place, to ensure that CIA Detainees were not, are not or will not be tortured or sub-

jected to cruel, inhuman or degrading treatment or punishment. Please include all records indicating how any such policies, procedures or guidelines were, are, or will be, communicated to personnel involved in the interrogation or detention of CIA Detainees.

9. All records indicating or discussing actual or possible violations of, or derivations from, the policies, procedures or guidelines referred to in Paragraph 4, above.

10. All records indicating or discussing serious injuries, illnesses, and/or deaths of any Unregistered, CIA, and/or "Ghost" Detainees.

11. All records, including autopsy reports and death certificates, relating to the deaths of any Unregistered, CIA, and/or "Ghost" Detainees.

12. All records relating to investigations, inquiries, or disciplinary proceedings initiated in relation to actual or possible violations of, or derivations from, the policies, procedures or guidelines referred to in Paragraph 4, above, including but not limited to records indicating the existence of such investigations, inquiries or disciplinary proceedings.

13. All records relating to the actual or alleged torture or other cruel, inhuman or degrading treatment or punishment of any Unregistered, CIA, and/or "Ghost" Detainee.

14. All records relating to policies, procedures or guidelines governing the role of health personnel in the interrogation of the Unregistered, CIA, and/or "Ghost" Detainees, including but not limited to the role of health personnel in the medical, psychiatric, or psychological assessment of Detainees immediately before, during or immediately after interrogation. Please include all records indicating how any such policies, procedures or guidelines were, are or will be communicated to personnel involved in the interrogation or detention of Detainees.

15. All records relating to medical, psychiatric or psychological assessment of any Unregistered, CIA, and/or "Ghost" Detainee or guidance given to interrogators by health personnel immediately before, during or immediately after the interrogation of any Unregistered, CIA, and/or "Ghost" Detainees.

16. All records indicating whether and to what extent the International Committee for the Red Cross ("ICRC") had, has or will have access to Unregistered, CIA, and/or "Ghost" Detainees, including but not limited to records related to particular decisions to grant or deny the ICRC access to any Detainee or group of Detainees.

17. All records indicating whether and to what extent any other non-governmental organization or foreign government had, has or will have access to the Unregistered, CIA, and/or "Ghost" Detainees, including but not limited to records related to particular decisions to grant or deny them access to any Detainee or group of Detainees.

(*Id.* at 4–6.)

### ii. *The AI Requests*

On April 25, 2006, AI, together with the WSLS, submitted two separate FOIA requests to the CIA. (*See* Hilton Decl. Ex. F and Brown Decl., Ex. B ("First AI FOIA Request"); Hilton Decl., Ex. G and Brown Decl., Ex. C ("Second AI FOIA Re-

quest").) The First AI FOIA Request, entitled "Request ... Concerning Detainees, including 'Ghost Detainees/Prisoners,' 'Unregistered Detainees/Prisoners,' and 'CIA Detainees/Prisoners[,]' " sought "any records reflecting, discussing or referring to the policy and/or practice concerning:"

1. The apprehension, transfer, detention, and interrogation of persons within the Scope of Request, including but not limited to:

 (a) The transfer of intelligence by one or more U.S. agencies or government officials to one or more foreign agencies or officials, in connection with the apprehension or detention of a person.

 (b) A request or direction by one or more U.S. agencies or government officials to one or more foreign agencies or officials regarding the apprehension of any person, and any related agreement concerning such apprehension.

 (c) The apprehension of a person in a foreign country by, with the involvement of, or in the presence of one or more U.S. officials.

 (d) The transfer of a person from any country to any other country for the purpose of detention and/or interrogation, at the direction or request or with the knowledge of one or more U.S. agencies or officials.

 (e) The transfer of a person from one place of detention to another within the same country at the direction or request or with the knowledge of one or more U.S. agencies or officials.

 (f) The detention of a person in a foreign country at the direction or request of one or more U.S. agencies or officials, including any agreement concerning the detention.

 (g) One or more U.S. agencies or officials seeking and/or being granted access to a foreign national detained in a foreign country.

 (h) One or more U.S. agencies or officials being present in a place of detention in a foreign country. This does not include visits to U.S. citizens by U.S. officials pursuant to the Vienna Convention on Consular Relations.

 (i) One or more U.S. agencies having control, direction, or administration of a subdivision, portion, or "cell" of a place of detention in a foreign country.

2. Current and former places of detention where individuals within the Scope of Request have been or are currently held, including but not limited to:

 (a) Any place of detention in a foreign country being under the control, direction, or administration of one or more U.S. agencies.

 (b) Any place of detention that is not under the control, direction or administration of one or more U.S. agencies, where a detainee is held at the request or instruction of one or more U.S. agencies or officials.

 (c) Any subdivision, portion, or "cell" of a place of detention in a foreign country under the control, direction, or administration of one or more U.S. agencies.

 (d) Any agreement between the U.S. government or one or more U.S. agencies or officials, and a foreign government or one or more foreign agencies or officials, in relation to a place of detention in a foreign country, regardless of whether that place of detention is foreign or U.S.—controlled.

3. The names and identities of detainees who fall within the scope of this request.

(First AI FOIA Request at 1, 4–5.) The Second AI FOIA Request, entitled "Request ... Concerning Ghost Detainee Memoranda, Department of Defense Detainee Reporting, Reports to Certain U.N. Committees, and the Draft Convention on Enforced Disappearance," sought the following records:

1. Any memorandum of understanding, or other record reflecting an agreement or proposed agreement between agencies, or between any agency and any subdivision or official, concerning the handling of ghost or unregistered detainees. This includes but is not limited to:

 (a) Any record reflecting communications about whether or not to draft any memorandum of understanding or agreement regarding unregistered or ghost detainees.

 (b) Any record reflecting communications about the content of any memorandum of understanding or agreement regarding unregistered or ghost detainees.

2. Any record reflecting a policy, whether formal or informal, about the reception, detention, or movement of unregistered or ghost detainees.

3. Any memorandum of understanding, or other record reflecting an agreement between any agencies, or between any subdivision or official or any other agency, regarding the transfer of detainees from the custody of one agency to that of another.

\* \* \*

5. Communications regarding the United States' Second Periodic Report to the Committee Against Torture, including but not limited to:

 (a) Communications regarding whether any individual, place of detention, or practice should be mentioned or discussed in the report to the Committee Against Torture.

 (b) Communications with a foreign government, or agency of a foreign government, regarding any provision of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment relating to apprehension, transfer and detention, (including Articles 1, 3, 5, 16), or whether any individual, place of detention, or practice should be mentioned or discussed in the report.

 (c) Proposed language or earlier drafts of the report to the Committee Against Torture.

6. Communications regarding the United States' Third Periodic Report to the Human Rights Committee, including but not limited to:

 (a) Communications regarding whether any individual, place of detention, or practice should be mentioned or discussed in the report to the Human Rights Committee.

 (b) Communications with a foreign government, or agency of a foreign government, regarding any provision of the International Covenant on Civil and Political Rights relating to apprehension, transfer and detention, (including Articles 6, 7, 9), or whether any individual, place of detention, or practice should be mentioned or discussed in the report.

 (c) Proposed language or earlier drafts of the report to the Human Rights Committee.

7. Any record reflecting communications regarding the negotiation or drafting of the draft Convention on the Protection of all Persons from Enforced Disappearance.

8. Any record reflecting communications with a foreign government, or an agency or official of a foreign government, regarding the drafting of the draft Convention on the Protection of all Persons from Enforced Disappearance.

(Second AI FOIA Request at 4–7.)

### iii. *The Specific FOIA Request*

On December 28, 2007, Plaintiffs submitted a fourth FOIA request entitled "Request ... for Specific Records Concerning Information on Secret Detention and Rendition." (Hilton Decl., Ex. H and Brown Decl., Ex. D ("Specific FOIA Request").) The request sought seventeen different categories of records including;

1. The spring 2004 report by the Office of the Inspector General (OIG) on the CIA's compliance with the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.

2. The list of "erroneous renditions" compiled by the CIA's OIG.

3. The fax sent by the CIA to the Royal Canadian Mounted Police Criminal Intelligence Directorate (RCMP CID) in the afternoon or evening of Oct. 3, 2002, asking a number of questions about Maher Arar.

4. The document sent by the CIA to the RCMP CID, the Canadian Security Intelligence Service (CSIS), and Project A–O Canada on Nov. 5, 2002 in response to requests for information on the whereabouts of Mr. Arar.

5. The cables between the Deputy Director of Operations (or other agency official(s)) at the CIA and the operative(s) in the field discussing and/or approving the use of a slap on detainee Abu Zubaydah (Zein al Abideen Mohamed Hussein).

6. The cables between the Deputy Director of Operations at the CIA (or other agency official(s)) and the operative(s) in the field discussing and/or approving the use of a slap on detainee Khalid Sheikh Mohammed.

7. The cables between the Deputy Director of Operations (or other agency official(s)) at the CIA and the operative(s) in the field discussing and/or approving the use of an 'attention shake' on Abu Zubaydah.

8. The cables between the Deputy Director of Operations at the CIA (or other agency official(s)) and the operative(s) in the field discussing and/or approving the use of an 'attention shake' on Khalid Sheikh Mohammed.

9. The cables between the Deputy Director of Operations at the CIA (or other agency official(s)) to the operative(s) in the field discussing and/or approving the use of sleep deprivation on Abu Zubaydah.

10. The cables between the Deputy Director of Operations at the CIA (or other agency official(s)) and the operative(s) in the field discussing and/or approving the use of sleep deprivation on Khalid Sheikh Mohammed.

11. The cables between the Deputy Director of Operations at the CIA (or other agency official(s)) and the operative(s) in the field discussing and/or approving the use of waterboarding on Abu Zubaydah.

12. The cables between the Deputy Director of Operations at the CIA (or other agency official(s)) and the operative(s) in the field discussing

and/or approving the use of waterboarding on Khalid Sheikh Mohammed.

13. Video tapes, audio tapes, and transcripts of materials related to interrogations of detainees that were acknowledged to exist during the case of *United States v. Zacharias Moussaoui* and described in a letter from United States Attorney Chuck Rosenberg to Chief Judge Karen Williams, United States Court of Appeals for the Fourth Circuit, and Judge Leonie Brinkema, United States District Court, Eastern District of Virginia, dated October 25, 2007, including, but not limited to two video tapes and one audio tape of interrogations of detainees, the transcripts of those tapes submitted for the court's review in the *Moussaoui* case, and the intelligence cables summarizing the substance of those tapes.

14. The Sept. 13, 2007 notification (described in a letter from Chuck Rosenberg to Judges Williams and Brinkema, dated October 25, 2007) from the attorney for the CIA informing the United States Attorney for the Eastern District of Virginia that the CIA had obtained a video tape of an interrogation of one or more detainees.

15. The communications between the CIA and the U.S. Embassy in Sana'a, Yemen, relating to the apprehension, transfer and/or detention of Mohamed Farag Ahmad Bashmilah (Muhammad Bashmilah). These communications likely occurred on or around March 5,

2005, and were preparatory to a communication between the U.S. Embassy in Sana'a and the Government of Yemen that has been acknowledged by the Government of Yemen.

16. The communications between the U.S. Government and the Government of Yemen, and/or any documents pertaining to the transfer of Mohamed Farag Ahmad Bashmilah from U.S. custody to the custody of the Government of Yemen on or near May 5, 2005. The Government of Yemen has acknowledged the existence of communications between the U.S. Government and the Government of Yemen concerning Mr. Bashmilah's transfer.

17. A copy of the files relating to Salah Nasser Salim Ali and Mohamed Farag Ahmad Bashmilah provided to the Government of Yemen on Nov. 10, 2005 by the United States Government. The Government of Yemen has acknowledged the existence of these files.

(*Id.* at 2–5.) [3]

B. *Procedural Background*

On April 28, 2008, the CIA filed a motion for summary judgment with respect to the CCR FOIA Request and both the First and Second AI FOIA Request pursuant to the Stipulation and Order between Plaintiffs and the Central Intelligence Agency Regarding Procedures for Adjudicating Summary Judgment Motions (the "First Stipulation") [dkt. no. 67]. On November 14, 2008, the CIA filed a second motion for summary judgment with re-

---

**3.** In their Memorandum of Law in support of their cross-motion, Plaintiffs withdrew their Categories 3 and 4 requests without prejudice and withdrew their Category 1 request for "the disclosure of the 'spring 2004 report by the [CIA] Office of the Inspector General ("OIG")' based on the CIA's representation that the document is being litigated in [a separate action]." (Pl. Mem. at 3 n. 6.)

spect to the Specific FOIA Request [dkt. no. 116], and Plaintiffs filed a cross-motion for summary judgment [dkt. no. 124].

On January 22, 2009, President Obama issued an Executive Order entitled, "Ensuring Lawful Interrogations." Exec. Order No. 13,491, 74 Fed. Reg. 4893 (Jan. 27, 2009). The Order suspended all interrogation techniques other than those found in the United States Army Field Manual and created a panel composed of various government officials to study whether the Army Field Manual provided "an appropriate means of acquiring the intelligence necessary to protect the Nation, and, if warranted, to recommend any additional or different guidance for other departments or agencies." *Id.* Following the issuance of President Obama's Executive Order, on or about April 16, 2009, the CIA released to Plaintiffs portions of the three memoranda from the Office of Legal Counsel of the Department of Justice, which had previously been withheld in full, withdrew both of its summary judgment motions, and Plaintiffs likewise withdrew their cross-motions.

On or about September 18, 2009, the parties entered into the Second Stipulation and Order Between Plaintiffs and the Central Intelligence Agency Regarding Procedures for Adjudicating Summary Judgment Motions (the "Second Stipulation") [dkt. no. 154], which set forth an agreement between the parties that set a schedule according to which the CIA would reprocess, and describe on a *Vaughn* index, certain records responsive to all four FOIA requests.

## C. CIA's Searches
### i. CIA's Record Systems

Due to the decentralized nature of the CIA's records systems, all FOIA requests are first processed by the Information and Privacy Coordinator, Information Management Systems ("IMS"), located within the Office of the Chief Information Officer ("OCIO"). (Hilton Decl. ¶ 24.) The request is then analyzed by an IMS information management professional who determines which CIA components reasonably might be expected to possess responsive records and transmits the records to the corresponding component. (*Id.* ¶ 25.) The various CIA components are contained within one of five directorates or office clusters: the National Clandestine Service (NCS), which is responsible for the clandestine collection of foreign intelligence from human sources and maintaining records of information on persons who are of foreign intelligence or counterintelligence interest to CIA and other U.S. Government agencies; the Directorate of Intelligence ("DI"), which analyzes, interprets, and forecasts foreign intelligence issues and world events of importance to the United States, is responsible for the production of finished intelligence reports for dissemination to policymakers in the U.S. Government; the Directorate of Science and Technology ("DS & T"), which is responsible for creating and applying technology to fulfill intelligence requirements; the Directorate of Support ("DS"), which provides the CIA with mission-critical services, including the protection of CIA personnel, security matters generally, facilities, communications, logistics, training, financial management, medical services, and human resources and maintains records on all current and former CIA employees as well as other individuals for whom security processing or evaluation has been required; and the Director of CIA Area ("DIR Area"), which is a cluster of offices directly responsible to the Director of CIA and is distinct from the other directorates. (*Id.* ¶¶ 26–31.) In each directorate, appropriately trained personnel

regularly conduct FOIA and Privacy Act searches. (*Id.*)

### ii. *The CIA's Initial Search for Responsive Records*

Pursuant to the First Stipulation, the parties agreed that the "withholding of records that have been or currently are being litigated in *American Civil Liberties Union v. Dep't of Def.*, No. 04 Civ. 4151(AKH)" (the "ACLU Action") will not be litigated in this action. (First Stipulation ¶ 1.) The parties also agreed that the search would be limited to non-operational files. (*Id.* ¶ 4.) The CIA's search of non-exempt files for documents responsive to the CCR FOIA Request and the First and Second AI FOIA Request focused on the CIA directorate determined by IMS to be the most likely to have records responsive to the Plaintiffs' request: the DIR Area.[4] (*Id.* ¶ 36.)

The DIR Area was thought to have responsive documents for two reasons: at the time the search was conducted, the President and the Director of CIA had acknowledged the existence of the detention program, and the nature of the requests was such that the responsive records would "likely [ ] be found in the cluster of components in the DIR Area, such as the Office of the General Counsel and the Office of Inspector General ("OIG")." (*Id.* ¶ 37.) Professionals in the relevant components searched their records systems for documents concerning rendition, including records analyzing the legality of rendition and records identifying the identities of any persons subject to detention or rendition. (*Id.* ¶ 38.) If a determination could not be made as to the responsiveness of a document, it was deemed responsive. (*Id.*)

The CIA's initial search located more than 7000 responsive records ("Responsive Records"). (*Id.* ¶ 40.) Of the Responsive Records, approximately 230 were located in the Office of General Counsel ("OGC"), approximately 89 were located in DIR Area components other than the OGC and OIG, and the remaining Responsive Records were found in the investigation files of the OIG (the "OIG Investigation Files"). (*Id.*) OIG Records pertaining to investigations that were open as of the date Plaintiffs filed their Complaint, June 7, 2007, but that had been closed by December 1, 2007 ("Additional OIG Records") were processed separately from the Responsive Records. (First Stipulation ¶ 4; Hilton Decl. ¶ 41.) In addition to the Responsive Records, the CIA identified more than 2100 responsive Additional OIG Records. (Hilton Decl. ¶ 41.)

### iii. *The CIA's Search Pursuant to Plaintiffs' Specific FOIA Request*

The CIA conducted searches for records responsive to categories 1, 2, 7, 8, and 11 through 14 of the Specific FOIA Request. (*Id.* ¶ 42.) The search for responsive records in each category will be discussed in turn.

#### a. *Category One*

Based on Plaintiffs' request, Hilton determined that the record requested refers to the OIG's Special Review regarding counterterrorism detention and interrogation activities, dated May 7, 2004 (the "Special Review"). (*Id.* ¶ 43.) The search

---

4. Although two responsive records were found in the DI (*see* Hilton Decl. ¶ 54), the IMS information management professionals determined that the DI's records systems would not be likely to contain responsive documents because the systems primarily contain finished intelligence reports and intelligence for analysis. (*Id.* ¶ 55.) The records maintained at the DI do not generally contain documents concerning specific covert operations or link specific analyses to specific intelligence sources; thus, the DI was not likely to possess responsive records. (*Id.*)

did not locate any other OIG report responsive to this category. (*Id.*) According to Hilton, because the Special Review was being litigated in the ACLU Action, she understood it to be outside the scope of this litigation and referred Plaintiffs to the version of the document that was released pursuant to rulings in the ACLU Action. (*Id.* ¶ 44.)

### b. *Category Two*

The CIA determined that any records responsive to Plaintiffs' request would be found in the files of the OIG Investigations Staff. (*Id.* ¶ 45.) The CIA officials responsible for this search consulted with the Deputy Assistant Inspector General for Investigations within the OIG ("OIG Deputy Assistant"). (*Id.* ¶ 46.) The OIG Deputy Assistant was serving in the OIG in May 2004 when the OIG issued the Special Review, so she was "intimately familiar with OIG investigations regarding CIA counterterrorism detention and interrogation activities, including renditions." (*Id.*) Also, because the OIG Deputy Assistant was involved in the search of OIG files and the review of documents in closed OIG investigations in connection with this case, she, too, was "intimately familiar with the documents in OIG files relating to CIA detainees." (*Id.*) In response to the search request for Category Two records, the OIG Deputy Assistant stated that no such documents exist. (*Id.* ¶ 48.)

### c. *Categories Seven and Eight*

In response to these requests, CIA officials consulted with the relevant NCS officials regarding the existence of such cables, and they stated that the "attention shake" was not an interrogation technique used by the CIA; thus, no responsive documents exist. (*Id.* ¶ 49.)

### d. *Categories Eleven and Twelve*

CIA officers searched within a word-searchable database of cables concerning Abu Zubaydah and Khalid Sheikh Mohammed during their detentions and interrogations. (*Id.* ¶¶ 50–51.) In searching the database, the CIA officers used search terms including "waterboard," "water," and other variations of "waterboard." (*Id.*) For Zubaydah, the search produced two responsive classified intelligence documents that are not part of the ACLU Action, and the officials determined that it was not likely that other responsive documents existed. (*Id.* ¶ 50) For Sheikh Mohammed, the search produced forty-nine classified intelligence cables, and officials determined that it was not likely that any other files would contain additional responsive records. (*Id.* ¶ 51.)

### e. *Category Thirteen*

CIA officers consulted NCS officers, who would be the most likely to identify and to locate responsive records, to search for potentially responsive records. (*Id.* ¶ 52.) The NCS officers determined that three transcripts, two video recordings, and one audio recording were the only responsive records that existed. (*Id.*)

### f. *Category Fourteen*

To search for this record, CIA officers consulted with the attorneys in the CIA Office of General Counsel who were familiar with the CIA's involvement in the case of *United States v. Zacharias Moussaoui.* (*Id.* ¶ 53.) The attorneys stated that no such written notification had been made but instead was made telephonically. (*Id.*)

### iv. *The Processing of Responsive Records*

Information Review Officers ("IROs") reviewed the records described in the *Vaughn* index attached to the Hilton Declaration (*see* Hilton Decl., Ex. A) to determine which FOIA exemptions applied to the information contained in the records and which non-exempt information could be segregated from the exempt information. (Hilton Decl. ¶ 57.) If officers determined that non-exempt portions could

not be segregated from the exempt portions, then the documents were withheld in full. (*Id.*) This review sometimes required the coordination with or referral to other CIA components or other agencies. (*Id.* ¶ 58.)

Once this review was completed, the CIA professionals conducted a review from a corporate perspective on behalf of the CIA to resolve conflicting recommendations, to ensure that the release or withholding determinations complied with the law and published CIA regulations, to identify additional exempt information that reflected overall CIA interests, and to produce the integrated final record copy of each document. (*Id.* ¶ 59.) Following the first review of the Responsive Records, the CIA released: (1) in whole or in part 104 records on April 15, 2008; (2) in part two additional records on June 20, 2008; and (3) one additional record on September 3, 2008. (*Id.* ¶ 61.) In July 2009, the CIA reprocessed the records listed in the *Vaughn* index and released in whole or in part an additional twenty-six records and re-released nine records that were previously released in part with fewer redactions. (*Id.* ¶ 62.)

Subsequent to the filing of the Motion for Summary Judgment, the CIA processed twenty-six records and determined that fifteen records (Documents 77, 87, 154, 155, 157, 229, 362, 363, 366, 367, 368, 369, 373, 378, 379, and 380) were properly withheld in full. (Second Hilton Decl. ¶ 6.) The CIA determined that eleven of those records (Documents 15, 22, 23, 38, 361, 362, 365, 371, 372, 381, and 382) were releasable in part and released those records on February 19, 2010. (*Id.*) In addition, on the same day, the CIA released a portion of additional material within Document 95. (*Id.*) On or about March 5, 2010, the CIA completed processing an additional five records and determined that all five records (Documents 370, 374, 375, 376, and 377) were releasable in part and released the records with appropriate redactions. (*Id.* ¶ 7.) Lastly, the Second Hilton Declaration attaches twenty-five revised *Vaughn* index entries that either withdraw (or restrict the scope of) previously asserted exemptions, and/or provide revised record descriptions. (*Id.* ¶ 9.)

As a result of the CIA's review and processing of the several thousand Responsive Records, the CIA has released to Plaintiffs approximately 133 records (the "Released Records") that are responsive to the CCR FOIA Request and the First and Second AI FOIA Requests. (Hilton Decl. ¶ 63.)

## II. LEGAL FRAMEWORK

### A. FOIA Summary Judgment Standard

A moving party is entitled to summary judgment only "if the pleadings, depositions, answers to interrogatories, and the admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that [moving party is] entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed. R. Civ. P. 56(c)), A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also Overton v. New York State Div. of Military and Naval Affairs,* 373 F.3d 83, 89 (2d Cir. 2004).

In assessing whether summary judgment is proper, the Court construes the evidence in the light most favorable to the non-moving party. *Lucente v. IBM Corp.,* 310 F.3d 243, 253 (2d Cir.2002), The mov-

ing party bears the initial burden of providing the basis for the motion and of identifying the evidentiary materials, if any, supporting their position. *See Grady v. Affiliated Cent., Inc.,* 130 F.3d 553, 559 (2d Cir.1997). The non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)). Mere speculation and conjecture will not suffice. *See Niagara Mohawk Power Corp. v. Jones Chem. Inc.,* 315 F.3d 171, 175 (2d Cir. 2003).

■ FOIA affords the public access to virtually any federal government record that FOIA itself does not specifically exempt from disclosure. 5 U.S.C. § 552; *Vaughn v. Rosen,* 484 F.2d 820, 823 (D.C.Cir.1973). Here, in reviewing the CIA's response to a FOIA request, the CIA has the burden of justifying nondisclosure, and the Court must ascertain whether the agency has sustained its burden of demonstrating that the documents requested are exempt from disclosure under FOIA and that the agency has adequately segregated exempt from non-exempt materials. 5 U.S.C. § 552(a)(4)(B); *Al–Fayed v. C.I.A.,* 254 F.3d 300, 305 (D.C.Cir.2001). An agency may meet its burden by providing the requester with a *Vaughn* index, adequately describing each withheld document and explaining the reason for the withholding. *James Madison Project v. C.I.A.,* 607 F.Supp.2d 109, 117 (D.D.C.2009) (citing *Summers v. Dep't of Justice,* 140 F.3d 1077, 1080 (D.C.Cir. 1998)); *see Vaughn,* 484 F.2d 820 (fashioning what is now commonly referred to as a "*Vaughn* index").

The court may grant summary judgment to an agency on the basis of its affidavits if they:

[ (1) ] describe the documents and the justifications for nondisclosure with reasonably specific detail, [ (2) ] demonstrate that the information withheld logically falls within the claimed exemption, and [ (3) ] are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.

*Military Audit Project v. Casey,* 656 F.2d 724, 738 (D.C.Cir.1981).

### B. *Adequacy of the Search*

■ "In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to the FOIA." *Carney v. U.S. Dep't of Justice,* 19 F.3d 807, 812 (2d Cir. 1994); *see also* 5 U.S.C. § 552(a)(4)(B). "Affidavits or declarations supplying facts indicating that the agency has conducted a thorough search and giving reasonably detailed explanations why any withheld documents fall within an exemption are sufficient to sustain the agency's burden." *Carney,* 19 F.3d at 812 (footnote omitted). "Affidavits submitted by an agency are accorded a presumption of good faith; accordingly, discovery relating to the agency's search and the exemptions it claims for withholding records generally is unnecessary if the agency's submissions are adequate on their face." *Id.*; *see McCready v. Nicholson,* 465 F.3d 1, 14 (D.C.Cir.2006) (" 'At the summary judgment stage, where the agency has the burden to show that it acted in accordance with the statute, the court may rely on a reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched.' " (quoting *Valencia–Lucena v. U.S. Coast Guard,* 180 F.3d 321, 326 (D.C.Cir.1999))). "When this is the case, the district court may 'forgo discovery and

award summary judgment on the basis of affidavits.'" *Carney,* 19 F.3d at 812 (quoting *Goland v. C.I.A.,* 607 F.2d 339, 352 (D.C.Cir.1978), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980)). "[O]nce the agency has satisfied its burden, the plaintiff must make a showing of bad faith on the part of the agency sufficient to impugn the agency's affidavits or declarations or provide some tangible evidence that an exemption claimed by the agency should not apply or summary judgment is otherwise inappropriate." *Id.* (citation omitted).

■ The CIA "must establish the adequacy of its searches by showing 'that the agency made a good faith effort to search for the requested documents, using methods reasonably calculated to produce documents responsive to the FOIA request.'" *Adamowicz v. I.R.S.,* 672 F.Supp.2d 454, 461–62 (S.D.N.Y.2009) (quoting *Garcia v. U.S. Dep't of Justice,* 181 F.Supp.2d 356, 366 (S.D.N.Y.2002)). The CIA's search for records does not have to be perfect, only reasonable, and the "failure to return all responsive documents is not necessarily inconsistent therewith: an agency 'is not expected to take extraordinary measures to find the requested records, but only to conduct a search reasonably designed to identify and locate responsive documents.'" *Amnesty Int'l USA v. C.I.A,* No. 07 Civ. 5435, 2008 WL 2519908, at *9 (S.D.N.Y.2008) (quoting *Garcia,* 181 F.Supp.2d at 368). Accordingly, the issue to be determined is whether "the search was reasonably calculated to discover the requested documents, not whether it actually uncovered every document extant . . . ." *Grand Cent. P'ship, Inc. v. Cuomo,* 166 F.3d 473, 489 (2d Cir. 1999). Reasonableness must be evaluated in the context of each particular request. *See Davis v. U.S. Dep't of Justice,* 460 F.3d 92, 103 (D.C.Cir.2006); *Weisberg v. U.S. Dep't of Justice,* 745 F.2d 1476, 1485 (D.C.Cir.1984). Although an agency is not required to search every record system, the agency must set forth in an affidavit why a search of other some record systems, but not others, would lead to the discovery of responsive documents. *See Oglesby v. U.S. Dep't of Army,* 920 F.2d 57, 68 (D.C.Cir.1990).

### i. *Sufficiency of the Hilton Declaration*

■ "[I]n adjudicating the adequacy of the agency's identification and retrieval efforts, the trial court may be warranted in relying upon agency affidavits." *Founding Church of Scientology of Wash., D.C., Inc. v. N.S.A.,* 610 F.2d 824, 836 (D.C.Cir. 1979). The Court's reliance is only appropriate when the agency's supporting affidavits are "'relatively detailed' and nonconclusory and . . . submitted in good faith." *Goland v. C.I.A.,* 607 F.2d 339, 352 (D.C.Cir.1978) (quoting *Vaughn v. Rosen,* 484 F.2d 820, 826 (D.C.Cir.1973)). "Even if these conditions are met the requester may nonetheless produce countervailing evidence, and if the sufficiency of the agency's identification or retrieval procedure is genuinely in issue, summary judgment is not in order." *Founding Church of Scientology,* 610 F.2d at 836. Here, the Court finds chat the Hilton Declaration is reasonably detailed, nonconclusory and submitted in good faith. Moreover, even though Ms. Hilton did not actually participate in the search, the declaration sufficiently details the search efforts made by CIA and other governmental personnel. *See Adamowicz,* 672 F.Supp.2d at 462 ("[T]here is no need for the agency to supply the affidavits from each individual who participated in the actual search.") (citation omitted).

### ii. *Adequacy of Search: CCR FOIA Request, First and Second AI FOIA Requests*

■ The searches performed in response to the CCR FOIA Request and the First and Second AI FOIA Requests were conducted in the DIR Area. As set forth in

the Hilton Declaration, the search was limited to the DIR Area for two reasons: (1) because the President and the CIA had acknowledged the existence of the CIA detention program, the Director's Area was likely to contain responsive documents, and (2) the nature of the requests was such that responsive records were likely to be found in a cluster of components in the DIR Area. (Hilton Decl. ¶ 37.) Plaintiffs argue that the reasons given by the CIA for limiting the search to the DIR Area were the result of a narrow interpretation of Plaintiffs' requests. (Pl. Mem. at 51–52.) While Plaintiffs are correct that an agency has a "duty to construe [FOIA requests] liberally," *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C.Cir.1995), "FOIA was not intended to reduce government agencies to full-time investigators on behalf of requesters." *Judicial Watch, Inc. v. Export–Import Bank*, 108 F.Supp.2d 19, 27 (D.D.C.2000) (quotation and citation omitted). The CIA's search resulted in thousands of responsive records that are "unrelated to policy and legal analyses, including operational cables." (Def. Reply at 46; First Stipulation ¶ 8.) Moreover, although many of the responsive documents are located in the CIA's operational records—records exempt from search by statute (*see* 50 U.S.C. § 431)—the parties agreed to search operational records in nonexempt files, *i.e.*, the OIG investigation files which are located in the DIR Area. (Hilton Decl. ¶ 35; Fist Stipulation ¶ 4.) Accordingly, the Court finds that the CIA's search of the DIR–Area was "reasonably calculated to discover the requested documents" even though it may not have "uncovered every document extant." *SafeCard Servs., Inc. v. S.E.C.*, 926 F.2d 1197, 1201 (D.C.Cir.1991); *see Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 489 (2d Cir.1999) (same).

■ In addition, Plaintiffs argue that the CIA's search was inadequate because subsequent to the CIA's search, two responsive documents were located in the DI. (Pl. Mem. at 52–53.) The discovery of these two records, Plaintiffs contend, belies the CIA's claim that its search was adequate, and therefore the CIA should have to run searches in the DI as well as other components. (*Id.*) However, "[a] reasonably calculated search does not require that an agency search every file where a document could possibly exist, but rather requires that the search be reasonable in light of the totality of circumstances." *Cooper v. U.S. Dep't of Justice*, No. 03–5172, 2004 WL 895748, at *1 (D.C.Cir. Apr. 23, 2004) (citing *SafeCard Servs., Inc.*, 926 F.2d at 1201). "[A]n agency need only pursue leads that raise red flags pointing to the probable existence of responsive agency records that arise during its efforts to respond to a FOIA request." *Wiesner v. F.B.I.*, 668 F.Supp.2d 164, 170–71 (D.D.C.2009). Moreover, "an agency's hesitancy to pursue potential leads after its search has been completed," does not lead to the conclusion that the agency's "search [was] inadequate." *Citizens for Responsibility and Ethics in Washington v. U.S. Dep't of the Interior*, 503 F.Supp.2d 88, 100 (D.D.C. 2007). As discussed above, the CIA's search of the DIR Area was reasonably calculated to locate responsive documents. The fact that two more responsive documents were located in an area that the CIA determined would probably not lead to uncovering responsive documents does not render the CIA's search inadequate. To find otherwise would reduce the CIA to "full-time investigators on behalf of requesters." *Judicial Watch, Inc.*, 108 F.Supp.2d at 27.

### iii. Adequacy of Search: Specific FOIA Request

#### a. Categories Seven and Eight

■ With regard to the CIA's search for responsive records to the Specific

FOIA Request, Plaintiffs again argue that a narrow interpretation of the individual requests resulted in an inadequate search. Specifically, as to Categories Seven and Eight, concerning the use of the "attention shake," Ms. Hilton stated that the " 'attention shake' was not an interrogation technique employed by the CIA" and therefore, no responsive documents exist. (Hilton Decl. ¶ 49.) Plaintiffs contend that instead of an "attention shake," an "attention grasp" was utilized by the CIA in interrogating detainees. (Pl. Mem. at 54; Satterthwaite Decl., Ex. XX.). Again, although "an agency is 'not obligated to look beyond the four corners of the request for leads to the location of responsive documents,' " the CIA's interpretation of Plaintiffs' request was too narrow in this instance. *Servicemembers Legal Def. Network v. U.S. Dep't of Def. et al.*, 471 F.Supp.2d 78, 86 (D.D.C.2007) (quoting *Kowalczyk v. U.S. Dep't of Justice*, 73 F.3d 386, 389 (D.C.Cir.1996)). The request specifically asked for cables "discussing and/or approving the use on an 'attention shake' " on either Abu Zubaydah or Khalid Sheikh Mohammed. (Brown Decl., Ex. D at 3.) In describing what was meant by "attention shake," Plaintiffs included a quote from a former CIA employee who detailed the technique as "[grabbing] the person by their lapels and [shaking] them." (*Id.*) In one of the three memoranda released on April 19, 2009, "attention grasp" was defined as follows: "This technique consists of grasping the individual with both hands, one hand on each side of the collar opening, in a controlled and quick motion." (Hilton Decl., Ex. J (May 10, 2005 Memorandum for John A. Rizzo Senior Deputy General Counsel, Central Intelligence Agency).) Even though Plaintiffs did not use the correct terminology, *i.e.*, "attention grasp," the accompanying definition was sufficient to put the CIA on notice of the documents Plaintiffs requested. Accord-

ingly, the CIA's search for documents responsive to Categories Seven and Eight was inadequate.

### b. *Category Two*

■ With regard to Category Two, the CIA adequately searched its records for lists pertaining to erroneous renditions. Plaintiffs' specific request, together with the quote from the Washington Post article referencing a list, make it clear that Plaintiffs were seeking an actual list, not information pertaining to erroneous renditions. "FOIA does not require an agency to create a document in response to a request." *Landmark Legal Found. v. E.P.A.*, 272 F.Supp.2d 59, 64 (D.D.C.2003) (citing *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 161–62, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975)). Here, Plaintiffs' request was clear: they were searching for a list that was referenced in a *Washington Post* article. (Specific FOIA Request at 2.) Having now learned that no such list exists, Plaintiffs cannot recharacterize their request as one for "information responsive to the underlying request." (Pl. Mem. at 55.) Nor can Plaintiffs rely on the argument that the CIA should have known what information Plaintiffs were seeking, for an agency receiving a FOIA request "is not required to divine a requester's intent." *Landmark Legal Found.*, 272 F.Supp.2d at 64; *see Hudgins v. IRS*, 620 F.Supp. 19, 21 (D.D.C.1985) ("[A]n agency is not required to have 'clairvoyant capabilities' to discover the requester's need."); *see also Thomas v. Office of the U.S. Attorney for E.D.N.Y.*, 171 F.R.D. 53, 55 (E.D.N.Y.1997) (FOIA requester cannot add to or enlarge underlying FOIA request during pendency of request or litigation). Accordingly, because the CIA conducted a thorough search for documents responsive to Plaintiffs' Category Two request—a search that included having the person most knowledgeable regarding CIA

counterterrorism detention and interrogation activities inquire into the existence of a list of erroneous renditions—the Court finds the CIA's search to be adequate.

### c. Categories Eleven and Twelve

■ Plaintiffs' Categories Eleven and Twelve requests seek cables between CIA officials and operatives in the field concerning the waterboarding of Abu Zubaydah and Khalid Sheikh Mohammed. (Specific FOIA Request at 4.) To conduct this search, CIA officers searched within word-searchable databases of cables maintained by the NCS that were designed to aggregate all CIA cables concerning Abu Zubaydah or Khalid Sheikh Mohammed during the time of his detention and interrogation. (Hilton Decl. ¶¶ 50–51.) Separate from the documents at issue in the ACLU Action, the search uncovered two records for Zubaydah and forty—or Mohammed. (Id.) Plaintiffs contend that the CIA's search was inadequate for two reasons. First, Plaintiffs argue that the CIA's explanation regarding the Zubaydah records is "insufficient because the records withheld in the [ACLU Action] are not described in a manner to permit Plaintiffs to determine the total number of records responsive to Category 11." (Pl. Mem. at 56.) Second, Plaintiffs point to publicly available documents that state that Khalid Sheikh Mohammed was waterboarded at least 183 times as evidence that the CIA's search was inadequate because it only returned forty-nine records, and according to CIA guidelines, operatives in the field were required to exchange cables with CIA headquarters before use of each technique. (Id. at 55.) Plaintiffs' arguments concerning the adequacy of the CIA's search are unavailing; Plaintiffs criticize the results of the CIA's search as "[defying] common sense" but do not criticize the search methods themselves. (Id.) "[T]he adequacy of a FOIA search is generally determined not by the fruits of the search,

but by the appropriateness of the methods used to carry out the search." Iturralde v. Comptroller of Currency, 315 F.3d 311, 315 (D.C.Cir.2003). Here, the CIA searched through the appropriate databases using different variations of the term "waterboard." The fact that this search did not produce what Plaintiffs consider an appropriate number of documents is irrelevant to the adequacy inquiry. Accordingly, the Court finds the CIA's search of records in response to Plaintiffs' Categories Eleven and Twelve requests to be adequate.

### III. EXEMPTION ANALYSIS

FOIA requires federal agencies to disclose agency records upon request. See 5 U.S.C. § 552(a). Disclosure is necessary "to promote honest and open government and to assure the existence of an informed citizenry to hold the governors accountable to the governed." Grand Cent. P'ship, Inc. v. Cuomo, 166 F.3d 473, 478 (2d Cir.1999). "FOIA's broad disclosure mandate consequently requires disclosure of documents unless they fall within one of the enumerated exemptions." Adamowicz v. I.R.S., 672 F.Supp.2d 454, 461 (S.D.N.Y.2009) (citing U.S. Dep't of the Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 7, 121 S.Ct. 1060, 149 L.Ed.2d 87 (2001)). The exemptions underscore Congress's "recognition that not all information should be released to the public but do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." Id. (internal citations and quotation marks omitted).

### A. FOIA Exemption 3

Under FOIA Exemption 3, an agency is permitted to withhold information that is "specifically exempted from disclosure by statute." 5 U.S.C. § 552(b)(3). "Under that exemption, the CIA need only show

that the statute claimed is one of exemption as contemplated by Exemption 3 and that the withheld material falls within the statute." *Larson v. U.S. Dep't of State,* 565 F.3d 857, 864 (D.C.Cir.2009) (citing *Fitzgibbon v. CIA,* 911 F.2d 755, 761–62 (D.C.Cir.1990)). "Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within that statute's coverage." *Goland v. C.I.A.,* 607 F.2d 339, 350 (D.C.Cir.1978).

### i. *The NSA and the CIA Act as Withholding Statutes*

██ The CIA relies on the National Security Act of 1947, as amended (the "NSA"), and the Central Intelligence Agency Act of 1949, as amended (the "CIA Act"), as the bases for its withholdings. (Def. Mem. at 12.) Section 102(A)(i)(1) of the Intelligence Reform and Terrorism Prevention Act of 2004, Pub.L. No. 108–458, 118 Stat. 3638 (codified at 50 U.S.C. § 403–1(i)(1)) ("IRTPA") requires the Director of National Intelligence ("DNI") to "protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 403–1(i)(1) (formerly 50 U.S.C. § 403–3(c)(7) ("In the [Director of the CIA's] capacity as head of the intelligence community, the Director shall ... protect intelligence sources and methods from unauthorized disclosure.")). The amendments made by the IRTPA transferred the authority for protecting intelligence from the Director of the CIA to the DNI.[5] Section 6 of the CIA Act authorizes the CIA to withhold information that would disclose

"the organization, functions, names, official titles, salaries, or numbers of [CIA] personnel." 50 U.S.C. § 403g.

Plaintiffs do not dispute that either Section 102(A)(i)(1) of the NSA or Section 6 of the CIA Act is an exemption statute. Rather, with respect to the NSA, Plaintiffs argue that the amendments made to the NSA through the IRTPA require a "more searching judicial review than the Supreme Court required in [*C.I.A. v. Sims,* 471 U.S. 159, 105 S.Ct. 1881, 85 L.Ed.2d 173 (1985)] into whether the CIA is properly withholding 'intelligence sources and methods.'" (Pl. Mem. at 23.) First, Plaintiffs contend that the DNI's "half-page memorandum" authorizing the withholding is insufficient "to satisfy [his] independent intelligence oversight responsibilities ...." (Pl. Mem. at 23 n. 50.) Second, in what Plaintiffs characterize as "an issue of first impression," Plaintiffs argue that the definition of "intelligence sources and methods" established by the Supreme Court in *Sims* and its progeny no longer controls and must be evaluated "in light of the IRTPA amendments, including provisions facilitating the disclosure to the private sector." (*Id.* at 24.) With respect to Section 6 of the CIA Act, Plaintiffs argue that the CIA invoked an overly broad reading of the statute to cover information other than "the organization, functions, names, official titles, salaries, or numbers of [CIA] personnel," 50 U.S.C. § 403g. (*See* Pl. Mem. at 25.)

### a. *DNI's Authorization Pursuant to 50 U.S.C. § 403–1(i)*

The Court finds Plaintiffs' argument— that the DNI's authorization is insuffi-

---

**5.** Because the IRTPA did not take effect until April 21, 2005, it was not in effect at the time of the CCR FOIA Request. *See ACLU v. U.S. Dep't of Def.,* 389 F.Supp.2d 547, 559 n. 8 (S.D.N.Y.2005) (apply "the withholding statute in effect at the time of plaintiffs' re-

quests"); *see also Pub. Citizen Health Research Group v. FDA,* 704 F.2d 1280, 1284 (D.C.Cir.1983) ("To invoke Exemption 3, an agency must demonstrate that ... a statute exists and was in effect at the time of the request ....").

cient—to be nothing more than a red herring.[6] Section 403–1(i) of the NSA provides that the DNI "shall protect intelligence sources and methods from unauthorized disclosure" and "may only delegate a duty or authority given [him] under this subsection to the Principal Deputy Director of National Intelligence." 50 U.S.C. § 403–1(i)(1), (3). Here, by memorandum dated September 18, 2009, the DNI, Dennis Blair, stated that: (1) he had "been advised that in connection with [this litigation] . . . certain information must be protected from public disclosure;" and (2) he "reviewed a sample" of the withheld records and determined that disclosure would "directly implicate sensitive intelligence sources and methods that must be protected from unauthorized disclosure in the interest of the national security of the United States." (Hilton Decl., Ex. N ("DNI Authorization").) As a result, the DNI authorized the CIA Director "to take all necessary and appropriate measures to ensure that these sources and methods are protected during the course of this litigation." (*Id.*) By drafting the DNI Authorization, the DNI sufficiently executed his duty "to protect intelligence sources and methods." *See, e.g., Gerstein v. C.I.A.*, No. 006–4643, 2008 WL 4415080 (N.D.Cal. Sept. 26, 2008) (noting that the DNI's brief authorization directing the CIA Director to "take all necessary and appropriate measures to ensure that [the] sources and methods are protected" merited a concession from Plaintiff in FOIA action that the authorization met the requirement set forth in 50 U.S.C. 403–1(i)).

b. *Intelligence Sources and Methods*

Plaintiffs' attack of the CIA's designation of the withheld information as "intelligence sources and methods" is three-

pronged: (1) the CIA uses the outmoded *Sims* rubric to define "intelligence sources and methods;" (2) the discontinued practices (*i.e.*, the use of black sites and the use of enhanced interrogation techniques) employed by the CIA are no longer intelligence sources and methods; and (3) illegal conduct is not an intelligence source or method. (Pl. Mem. at 21–25.)

1. *Intelligence Sources and Methods*

Plaintiffs contend that the amendments to the NSA through IRTPA have "undermined" the definition of intelligence sources and methods as set forth in *Sims*. (Pl. Mem. at 23.) Plaintiffs' argument vastly overstates the effect that the enactment of IRTPA had on the NSA. Of the three IRTPA provisions Plaintiffs reference in their brief as providing proof that Congress has "not acquiesced to the *Sims* interpretation of 'intelligence sources and methods,'" (Pl. Reply at 22), only one provision actually amended the NSA (*see* Pub.L. No. 108–457 at § 1101(a)) by conferring upon the DNI the "authority to ensure maximum availability of and access to intelligence information within the intelligence community consistent with national security requirements." 50 U.S.C. § 403–1(g)(1). Moreover, Plaintiffs' cherry-picking of one line from the Congressional Record more than ten years prior to the enactment of IRTPA does not persuade the Court that Congress disagreed with the Supreme Court's analysis of intelligence sources and methods in *Sims*. (Pl. Mem. at 24 n. 52.) To the contrary, even after the enactment of IRTPA, several courts, including the Court of Appeals for the Second Circuit, have continued to use the *Sims* framework when analyzing the issue of intelligence sources and methods.

**6.** Plaintiffs' argument would only apply to the First and Second AI FOIA Requests and the Specific FOIA Request because the CCR FOIA Request would have been subject to the NSA before the IRTPA amendments. The IRTPA amendments did not take effect until April 21, 2005, and the CCR FOIA request was made on December 21, 2004.

*See, e.g., Wilner v. N.S.A.,* 592 F.3d 60, 72 (2d Cir.2009) (following *Sims* framework in the context of analyzing an agency's invocation of a *Glomar* response pursuant to Exemption 3); *Larson v. U.S. Dep't of State,* 565 F.3d 857, 865 (D.C.Cir.2009) (acknowledging that " 'Congress gave the Agency broad power to control the disclosure of intelligence sources' " and therefore concluding that the CIA's affidavits, which confirmed that the withheld documents related to intelligence sources and methods, were sufficient to entitle the CIA to withhold the records pursuant to Exemption 3) (quoting *C.I.A. v. Sims,* 471 U.S. 159, 173, 105 S.Ct. 1881, 85 L.Ed.2d 173 (1985)). Accordingly, in analyzing the CIA's claim that releasing the withheld documents would reveal intelligence sources and methods, the Court will utilize the *Sims* framework.

■■■ Having resolved that the NSA is a withholding statute (*see supra* III.A.i.a), the Court "must consider whether the withheld material satisfies the criteria of the exemption statute." *Wilner,* 592 F.3d at 72 (citations omitted). To do so, the Court must determine whether the CIA has sufficiently demonstrated that the "release of the requested information can reasonably be expected to lead to unauthorized disclosure of intelligence sources and methods . . . ." *Phillippi v. C.I.A.,* 546 F.2d 1009, 1015 (D.C.Cir.1976). In evaluating this question, the Court "accord[s] substantial weight and due consideration to the CIA's affidavits." *Fitzgibbon v. C.I.A.,* 911 F.2d 755, 762 (D.C.Cir.1990); *Church of Scientology of Cal., Inc. v. Turner,* 662 F.2d 784, 785 (D.C.Cir.1980) (agency's affidavits must make a "showing of the particularized harm that could be expected to occur from production of the requested information").

Here, all but three of the documents in the *Vaughn* index have been withheld in whole or in part based on Exemption 3.

(*See* Def. Mem., Addendum.) The CIA, through the Hilton Declaration sets forth the various intelligence sources and methods that would be compromised should the CIA have to disclose the withheld documents. By invoking Exemption 3, the CIA withheld records concerning:

the use of human sources for intelligence gathering (Hilton Decl. ¶¶ 93–99); the collection of information from foreign liaisons and governments (*id.* ¶¶ 100–10); the use of cover identities for CIA employees and the mechanisms used to protect those activities (*id.* ¶¶ 119–23); information regarding CIA's operation of covert field installations abroad (*id.* ¶¶ 124–27); the use of cryptonyms and pseudonyms (*id.* ¶¶ 128–32); dissemination control markings (*id.* ¶¶ 136–39); clandestine intelligence collection operations (*id.* ¶¶ 140–45); the CIA's terrorist detention and interrogation program (*id.* ¶¶ 146–54); and interrogation operations, including the CIA's former use of EITs ((*id.* ¶¶ 149, 161–62)).

As discussed above, Exemption 3 provides the CIA with broad discretion to withhold records so long as the records are covered by the withholding statute. *ACLU v. U.S. Dep't of Def.,* 664 F.Supp.2d 72, 78 (D.D.C.2009) ("It is within defendants' broad discretion to determine 'whether disclosure of information may lead to an unacceptable risk of compromising the . . . intelligence-gathering process.' " (quoting *Sims,* 471 U.S. at 180, 105 S.Ct. 1881)). Several courts have found that the groups of records set forth in the Hilton Declaration are properly withheld as "intelligence sources and methods." *See Morley v. C.I.A.,* 699 F.Supp.2d 244, 252–53, 254–55 (D.D.C.2010) ("clandestine human intelligence sources" were properly withheld under both Exemptions 1 and 3); *Halpern v. F.B.I.,* No. 94–CV–365A, 2002 WL 31012157, at *9 (W.D.N.Y. Aug. 31, 2002) (holding Exemption 3 was applicable

to prevent unauthorized disclosure of "foreign intelligence sources and methods"); *Schoenman v. F.B.I.*, No. 04 Civ. 2202, 2009 WL 763065, at *25 (D.D.C. Mar. 19, 2009) (finding that Exemption 3 covered intelligence methods including "the use of cryptonyms and pseudonyms, and the use of dissemination-control markings"). Accordingly, the Court finds that the requested records fit within the statutory exemption allowing the CIA to withhold records that would disclose "intelligence sources and methods," 50 U.S.C. § 403–1(i), or "the organization, functions, names, official titles, salaries, or numbers of [CIA] personnel," 50 U.S.C. § 403g.

### 2. *Discontinued Practices*

Plaintiffs contend that because the use of EITs and the CIA detention centers have been prohibited by the President, those "sources and methods the CIA seeks to shield no longer 'fall within the Agency's mandate.'" (Pl. Mem. at 21 (quoting *C.I.A. v. Sims*, 471 U.S. 159, 169, 105 S.Ct. 1881, 85 L.Ed.2d 173 (1985)).) The District Court for the District of Columbia addressed a similar argument in *ACLU v. U.S. Dep't of Def.*, 664 F.Supp.2d 72 (D.D.C.2009) where plaintiffs were seeking documents related to fourteen named detainees held at the United States Naval Base in Guantanamo Bay, Cuba. The plaintiffs argued that the discontinuance of the EIT program as well as the closure of the CIA detention facilities justified "full disclosure of the records sought." *Id.* at 77. In rejecting this theory, the Court found that "[a] government record remains classified until a government official determines that 'the public interest in disclosure outweighs the damage to the national security that might reasonably be expected from disclosure.'" *Id.* (quoting Exec. Order No. 12,958 § 3.1(b)). Here, Plaintiffs try to distinguish *ACLU v. U.S. Dep't of Def.* by arguing that they only seek "records describing past and discontinued practices, not those still in use under the [Army Field Manual], and not those with information acquired during interrogations." (Pl. Reply at 7.) However, as detailed in the Hilton Declaration, "[e]ven though ... certain details of the CIA Detention Program, such as the use of [EITs], have been discontinued, the information withheld from the documents would still be of value to al Qa'ida and must be protected because the withheld information provides insight not only into the use of EITs and conditions of confinement, but also into the strategy and methods used by the United States when conducting any sort of interrogation, including those under the Army Field Manual." (Hilton Decl. ¶ 150.) Hilton further testified that the disclosure of records "would not only inform al Qa'ida about the historical use of EITs but also what techniques the United States would use in a current interrogation." (*Id.*) The Court is in no position to second-guess the CIA's determination that the disclosure of such information "would cause serious or exceptionally grave damage to the national security of the United States ...." (*Id.* ¶ 154.) Accordingly, the Court finds that Exemption 3 applies to the records despite the fact that the cessation of the CIA's use of EITs and foreign detention centers because the CIA's "disclosure of the [information] reasonably could be expected to result in damage to national security ...." *ACLU*, 664 F.Supp.2d at 78–79.

### 3. *Alleged Illegality of CIA's Sources and Methods*

Notwithstanding the fact that the information properly falls within the classification of "intelligence sources and methods," Plaintiffs contend that Exemption 3 "cannot shield unlawful intelligence sources and methods because the unlawful activity falls outside an agency's mandate." (Pl. Mem. at 22.) Plaintiffs' argument, though, is similar to the argument made by the

plaintiffs in *Wilner v. N.S.A.*, No. 07 Civ. 3883, 2008 WL 2567765 (S.D.N.Y. June 25, 2008), *aff'd*, 592 F.3d 60 (2d Cir.2009). In *Wilner*, plaintiffs sought documents concerning the Government's Terrorist Surveillance Program, which enabled the NSA to "intercept the international communications of people with known links to al Qaeda and related terrorist organizations." *Id.* at *5. The defendants invoked FOIA Exemption 3 and withheld the documents pursuant to Section 6 of the NSA and Section 102(A)(i)(1) of IRTPA. *Id.* at *3. Plaintiffs, in turn, argued that Exemption 3 was inapplicable because "the [Terrorist Surveillance Program] is illegal … and … FOIA exemptions cannot be invoked to facilitate the concealment of unlawful activity." *Id.* at *6. The Court rejected the plaintiffs' argument finding that "all that is necessary for the NSA to successfully resist disclosure under Exemption 3 is to explain how the requested documents would reveal information integrally related to … NSA activity." *Id.* (citation and internal quotation marks omitted). In addition, "the fact that [President Obama] outlawed the use of [enhanced interrogation techniques] and the CIA's operation of detention centers does not warrant full disclosure of the records at issue in this case." *ACLU v. U.S. Dep't of Def.*, 664 F.Supp.2d 72, 77–78 (D.D.C.2009). Accordingly, because the records at issue fall under the coverage of Exemption 3, the CIA is permitted to withhold their disclosure regardless of the alleged illegality of the practices contained therein. *See ACLU v. Dep't of Def.*, 723 F.Supp.2d 621, 628, 629, 2010 WL 2787645, at **5, 6 (S.D.N.Y. July 15, 2010) (finding that "to limit Exemption 3 to 'lawful' intelligence sources and methods, finds no basis in the statute" and that "[d]eclining to reach the legality of the underlying conduct is not … an abdication of … the Court's responsibility … under the statutory structure [; i]t is the result commanded by the statute"); *see also Lesar v. U.S. Dep't of Justice*, 636 F.2d 472, 483 (D.C.Cir.1980) (holding that although the "surveillance of [the FBI's target] strayed beyond the bounds of its initial lawful security aim, that does not preclude the possibility that the actual surveillance documents and the Task Force materials that comment upon those documents may nevertheless contain information of a sensitive nature, the disclosure of which could compromise legitimate secrecy needs"); *see also Agee v. C.I.A.*, 524 F.Supp. 1290, 1292 (D.D.C. 1981) ("While some of the documents shed light on the legality or illegality of CIA's conduct, the (b)(1) or (b)(3) claims are not pretextual. Any possibility of illegal conduct on the part of the CIA does not defeat the validity of the exemptions claimed.").

### B. *FOIA Exemption 1*

█ Because the Court finds that the CIA properly invoked Exemption 3 as its basis to withhold the bulk of the documents listed in the *Vaughn* index, it need not consider whether the withheld information also meets the criteria for classification under Exec. Order No. 12,958. *Assassination Archives and Research Ctr. v. C.I.A.*, 334 F.3d 55, 58 n. 3 (D.C.Cir.2003) ("Because we conclude that the Agency easily establishes that the records AARC seeks are exempt from disclosure under Exemption 3, we do not consider the applicability of Exemption 1."). Regardless, even if the CIA did not invoke Exemption 3 to withhold most of the records, the CIA still would have been justified in withholding the records by invoking Exemption 1.

Pursuant to FOIA Exemption 1, an agency is allowed to withhold records that are: "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in

fact properly classified pursuant to such Executive order," 5 U.S.C. § 552(b)(1)(A), (B). Here, the CIA relies on Executive Order No. 12,958, 60 Fed. Reg. 19,825 (Apr. 17, 1995), "which provides a detailed system for classifying documents that the government determines should be kept secret." [7] *ACLU v. U.S. Dep't of Def.*, 664 F.Supp.2d 72, 75 (D.D.C.2009). Pursuant to this Executive Order, "[i]nformation shall not be considered for classification unless its unauthorized disclosure could reasonably be expected to cause identifiable or describable damage to the national security . . . and it pertains to one or more of the following: . . . (b) foreign government information; (c) intelligence activities (including covert action), intelligence sources or methods, or cryptology; [or] (d) foreign relations or foreign activities of the United States, including confidential sources." Exec. Order No. 13,526 at § 1.4. In addition, the Executive Order provides that "[i]n no case shall information be classified, continue to be maintained as classified, or fail to be declassified in order to: (1) conceal violations of law, inefficiency, or administrative error; (2) prevent embarrassment to a person, organization, or agency; . . . or (4) prevent or delay the release of information that does not require protection in the interest of the national security." *Id.* § 1.7(a).

To withhold records under Exemption 1, the CIA must establish that it complied with proper procedures in classifying materials and that the withheld information falls within the substantive scope of Exec. Order No. 12,958. *See Salisbury v. United States*, 690 F.2d 966, 971–72 (D.C.Cir. 1982). An agency invoking Exemption 1 is entitled to summary judgment on the basis of agency affidavits "if the affidavits describe the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C.Cir.1981). Judicial deference for an agency's justifications under Exemption 1 is only warranted when the agency's affidavits are first found, at a minimum, to "contain sufficient detail to forge the 'logical connection between the information [withheld] and the claimed exemption.'" *Physicians for Human Rights v. U.S. Dep't of Def.*, 675 F.Supp.2d 149, 167 (D.D.C.2009) (quoting *Oglesby v. U.S. Dep't of Army*, 79 F.3d 1172, 1178 (D.C.Cir.1996)); *see Casey*, 656 F.2d at 738 (finding that because national security agencies "have unique insights into what adverse [effects] might occur as a result of public disclosures," courts are "required to accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record.") (internal quotation marks omitted). In reviewing the CIA's affidavits, however, the Court is "mindful that issues of national security are within the unique purview of the executive branches, and that as a practical matter, few judges have the skill or experience to weigh the repercussions of disclosure of intelligence information." *Physicians for Human Rights*, 675 F.Supp.2d at 166 (citations and internal quotation marks omitted).

**7.** Executive Order No. 12,928 was amended by Executive Order No. 13,292, 68 Fed. Reg. 15,315 (Mar. 28, 2003). Although Executive Order 13,292 was revoked and replaced by Executive Order 13,526, 2009 WL 5179737 (Dec. 29, 2009), for purposes of Exemption 1, a classification decision should be considered in regard to the terms of the Executive Order under which the decision was made. *See King v. U.S. Dep't of Justice*, 830 F.2d 210, 216 (D.C.Cir.1987). Accordingly, all citations to Executive Order No. 12,958 are to the Order as amended by Executive Order No. 13,292.

Here, the CIA supports its withholdings through the Hilton Declaration and the Declaration of Leon Panetta, the Director of the CIA (Hilton Decl., Ex. M ("Panetta Decl.")). Based on these declarations, which the Court finds contain "sufficient detail to forge the logical connection between information [withheld] and [Exemption 1]," *Physicians for Human Rights,* 675 F.Supp.2d at 167 (quoting *Oglesby,* 79 F.3d at 1178), the CIA has adequately supported its withholding under Exemption 1. Plaintiffs challenge the CIA's Exemption 1 withholdings on several grounds; however, for the reasons discussed below, each of the Plaintiffs' arguments is unavailing.

### i. *Disclosure Not Likely to Harm National Security*

Plaintiffs argue that the disclosure of the withheld documents would not result in harm to national security because: (1) the documents relate to discontinued CIA activities; or (2) the documents relate to CIA programs whose details have been disclosed to the public; or (3) the potential of harming foreign relations is minimal because several foreign governments have already launched investigations of their own.

### a. *Discontinued Activity*

As the result of President Obama's order directing the discontinuance of EITs, Plaintiffs contend that the disclosure of records concerning the now-defunct interrogation program cannot harm national security because "revelation cannot reduce the effectiveness of prohibited practices." (Pl. Mem. at 10.) However, as discussed above (*see supra* III.A.b.2), both the Hilton Declaration and the Panetta Declaration provide the Court with a sufficient basis to find that release of the records would harm national security. For instance, Hilton stated that "[e]ven though . . . certain details of the CIA Detention Program, such as the use of enhanced interrogation techniques, have been discontinued, the information withheld from the documents would still be of value to al Qa'ida and must be protected because the withheld information provides insight not only into the use of EITs and conditions of confinement, but also into the strategy and methods used by the United States when conducting any sort of interrogation, including those under the Army Field Manual." (Hilton Decl. ¶ 150.) The disclosure of records "would not only inform al Qa'ida about the historical use of EITs but also what techniques the United States would use in a current interrogation." (*Id.*) Director Panetta averred in the ACLU Action that "[e]ven if the EITs are never used again, the CIA will continue to be involved in questioning terrorists under legally approved guidelines. The information in these documents would provide future terrorists with a guidebook on how to evade such questioning." (Panetta Decl. ¶ 11.)

Although Plaintiffs argue that the CIA's unclassified declarations are insufficient "to carry its burden to support its [Exemption 1] withholdings," Plaintiffs request that the Court not conduct an *in camera* review of the classified declarations submitted *ex parte* because the "CIA has failed to meet [the] burden" that is required for the Court to conduct an *in camera* review. (*See* Pl. Mem. at 10; Pl. Reply at 3–4.) In a FOIA action involving information that may be harmful to national security if revealed, the Court may conduct an *in camera* review after the court has attempted "to create as complete a public record as is possible." *Phillippi v. C.I.A.,* 546 F.2d 1009, 1013 (D.C.Cir.1976); *see also Wilner v. N.S.A.,* 592 F.3d 60, 76 (2d Cir.2009) (holding that "'[i]f an agency's statements supporting exemption contain reasonable specificity of detail as to demonstrate that the withheld information logically falls within the

claimed exemption and evidence in the record does not suggest otherwise … the court should not conduct a more detailed inquiry to test the agency's judgment and expertise or to evaluate whether the court agrees with the agency's opinions'" (quoting *Larson v. U.S. Dep't of State,* 565 F.3d 857, 865 (D.C.Cir.2009))). Here, the public declarations of Hilton and Panetta provide rationales for the CIA's withholdings. However, the Court appreciates Plaintiffs' complaint that the public declarations do not provide sufficient detail to warrant withholding pursuant to Exemption 1, and instead, only conclusory assert that disclosure could detract from the effectiveness of future interrogations. *See Hayden v. N.S.A.,* 608 F.2d 1381, 1385 (D.C.Cir.1979) (recognizing that "[i]n a limited range of security cases, it is simply not possible to provide for orderly and responsible decisionmaking about what is to be disclosed, without some sacrifice to the pure adversary process"); *see also In re N.Y. Times Co.,* 577 F.3d 401, 410 n. 4 (2d Cir.2009) ("noting that although there are circumstances in which a nonpublic proceeding is appropriate, "courts seek to balance the need for transparency in the judiciary with the effective protection of sensitive information""). Taking all of this into consideration, the Court reviewed the classified versions of the Hilton and Panetta Declarations and, deferring to these executive declarations predicting harm to the national security, concludes that the disclosure of the withheld documents would pose a significant risk to national security. *See Wilner,* 592 F.3d at 76 (" '[W]e have consistently deferred to executive affidavits predicting national harm, and have found it unwise to undertake searching judicial review.' " (quoting *Ctr. For Nat'l Sec. Studies v. Dep't of Justice,* 331 F.3d 918, 927 (D.C.Cir.2003))). Accordingly, the Court finds that even though the practices at issue have been discontinued, the CIA is still justified in withholding the requested documents pursuant to Exemption 1.

b. *Public Disclosure of CIA Practices*

In support of their argument in favor of disclosure, Plaintiffs principally rely on the fact that details of the CIA's use of EITs and its practice of rendition have been extensively disclosed. Several of the now-public documents include, *inter alia*:(1) a December 30, 2004 fax from an Associate General Counsel, CounterTerrorism Center, CIA to Dan Levin, Acting Assistant Attorney General, Office of Legal Counsel, Dep't of Justice, which contained a background paper on the CIA's combined use of interrogation techniques (Satterthwaite Decl., Ex. X ("CIA Background Paper")); (2) a May 10, 2005 Memorandum from Steven G. Bradbury, Principal Deputy Assistant Attorney Gen., CIA, to John A Rizzo, Senior Deputy General Counsel, CIA regarding the Application of 18 U.S.C. §§ 2340–2340A to the Combined Use of Certain Techniques in the Interrogation of High Value al Qaeda Detainees (Satterthwaite Decl., Ex. RRR ("May 10, 2005 Combined Techniques Memo")); (3) a May 30, 2005 Memorandum from Steven G. Bradbury to John A. Rizzo regarding the Application of United States Obligations Under Article 16 of the Convention Against Torture to Certain Techniques that May Be Used in the Interrogation of High Value al Qaeda Detainees (Satterthwaite Decl., Ex. Y ("May 30, 2005 Art. 16 Techniques Memo")).

The Court of Appeals for the Second Circuit recently addressed the issue of public disclosure of classified information in *Wilson v. C.I.A.,* 586 F.3d 171 (2d Cir. 2009). There, the court addressed whether the wide disclosure of information related to Valerie Plame Wilson's employment with the CIA constituted an official disclosure. Classified information "is deemed to have been officially disclosed only if it (1)

'[is] as specific as the information previously released,' (2) 'match[es] the information previously disclosed,' and (3) was 'made public through an official and documented disclosure.'" *Id.* at 186 (quoting *Wolf v. C.I.A.*, 473 F.3d 370, 378 (D.C.Cir.2007)). As to the last factor, "the law will not infer official disclosure of information classified by the CIA from (1) widespread public discussion of a classified matter, (2) statements made by a person not authorized to speak for the Agency, or (3) release of information by another agency, or even by Congress." *Id.* (internal citations omitted).

Here, despite the various disclosures of general information concerning the CIA's EIT and rendition programs, Plaintiffs are not entitled to the withheld documents because, according to the government's declarations, the information sought pertains to the application of the EITs to specific detainees. (Def. Reply at 17–18.) Indeed, "the fact that the government disclosed general information on its interrogation program does not require full disclosure of aspects of the program that remain classified." *ACLU v. U.S. Dep't of Def.*, 664 F.Supp.2d 72, 77 (D.D.C.2009); *see Fitzgibbon v. C.I.A.*, 911 F.2d 755, 766 (D.C.Cir.1990) (recognizing that even though some general information is publicly available, it "does not eliminate the possibility that further disclosures can cause harm to intelligence sources, methods and operations"). The Court finds that the information contained in the withheld records are more detailed than the information that already exists in the public domain and would seriously damage national security if released. *ACLU*, 664 F.Supp.2d at 77. Accordingly, the Court concludes that the public disclosures do not require the CIA to disclose the withheld records because the specific information sought by Plaintiffs has not been officially disclosed. *Wilson*, 586 F.3d at 186.

### c. *Further disclosures not likely to harm foreign relations*

Plaintiffs further contend that the CIA makes a spurious argument that disclosure of documents may harm foreign relations, especially in light of the fact that several foreign states "have launched investigations and released information on their own involvement with the CIA's practices." (Pl. Mem. at 16.) The CIA argues that because foreign governments provided substantial assistance to counterterrorism operations "under the condition that their assistance be kept secret," "[i]f the United States demonstrates that it is unwilling or unable to stand by its commitments to foreign governments, they will be less willing to cooperate with the United States on counterterrorism activities," (Hilton Decl. ¶ 153.) Plaintiffs' recitation of countries that have launched investigations, though, does not overcome the substantial deference the court must afford the agency in matters of national security. *See, e.g., Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C.Cir.1981), Plaintiffs offer no contrary evidence that shows that releasing the information will not harm foreign relations. Moreover, even if Plaintiffs are correct that the disclosure of the records would not harm foreign relations, for the reasons discussed above, the records should not be released because the information poses a risk to national security. (*See supra* III.B.i.a.)

### ii. *Concealment of Improper, Unlawful, or Embarrassing Conduct*

Plaintiffs contend that the CIA should not be permitted to invoke Exemption 1 because Exec. Order No. 12,958 forbids classifications "that were made to 'conceal violations of law, inefficiency, or administrative error,' to 'prevent embarrassment,' or to 'prevent or delay the release of information that does not require protection in the interest of national security.'" (Pl.

Mem. at 17 (quoting Exec. Order No. 12,-958, 68 Fed. Reg. 15315, 15318 (Mar. 28, 2003)).) In essence, Plaintiffs conclude that because some of the CIA's techniques are illegal, the CIA therefore classified the documents to conceal the alleged illegality. Plaintiffs, though, offer no support for this theory. As the Court of Appeals held in *Wilner*, "[a] finding of bad faith must be grounded in 'evidence suggesting bad faith on the part of the [agency].' 'Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible.' " *Wilner*, 592 F.3d at 75 (quoting *Larson*, 565 F.3d at 864, 862). Following the reasoning of the Court of Appeals in *Wilner*, the Court finds that the agency's justification for classification to be both "logical and plausible [and finds no] evidence that even arguably suggests bad faith on the part of the [CIA]." *Id.*

### iii. *Unlawful Activities Cannot Be Considered Intelligence Sources and Methods*

Finally, for the reasons discussed more fully above in III.A.i.b.3, the fact that the interrogation methods may now be considered illegal does not mean that the information cannot be withheld pursuant to Exemption 1.

### C. *Glomar Responses*

With respect to Categories 3–4,[8] 5–6, 9–10, and 15–17 of the Specific FOIA Request, the CIA refused to confirm or deny the existence of any such records responsive to those requests.[9] The CIA invokes FOIA Exemptions 1 and 3 to support its decision not to divulge whether the requested documents exist claiming that revealing the existence of the documents: (1)

"could reasonably be expected to result in the unauthorized disclosure of intelligence sources and methods, by showing that [ (a) ] a response would reveal intelligence sources and methods; and [ (b) ] such disclosures would be unauthorized," (Def. Mem. at 30–31); and (2) "[a] would necessarily reveal properly classified information regarding intelligence activities, sources, and methods, or foreign relations or activities; and [b] could reasonably be expected to cause at least serious damage to the national security," (*id.* at 34.). Plaintiffs argue that the CIA is in no position to assert a *Glomar* response because the information the CIA sought already "has been officially acknowledged." (Pl. Mem. at 28.) Plaintiffs contend that because the CIA has officially acknowledged both the use of EITs on specific detainees and the rendition and detention of detainees, there can be no possible harm to national security, and, in any event, the CIA has effectively waived its right to assert a *Glomar* response. (*Id.*)

The Court of Appeals recently held that " 'an agency may refuse to confirm or deny the existence of records where to answer the FOIA inquiry would case harm cognizable under a[ ] FOIA exception.' " *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 68 (2d Cir.2009) (quoting *Gardels v. C.I.A.*, 689 F.2d 1100, 1103 (D.C.Cir.1982)). A *Glomar* response is not sufficient on its own; rather, an agency asserting the response "must tether it to one of the nine FOIA exemptions [ ] and explain why the requested documents fall within the exemption identified." *Wilner v. Nat'l Sec. Agency*, No. 07 Civ. 3883, 2008 WL 2567765, at *3 (S.D.N.Y. Jun. 25, 2008),

---

**8.** As noted above, Plaintiffs withdrew their requests for documents responsive to Categories 3 and 4.

**9.** "Such an agency response is known as a *Glomar* response and is proper if the fact of

the existence or nonexistence of agency records falls within a FOIA exemption." *Wolf v. C.I.A.*, 473 F.3d 370, 374 (D.C.Cir.2007); *see also Phillippi v. C.I.A.*, 546 F.2d 1009, 1011 (D.C.Cir.1976).

*aff'd* 592 F.3d 60 (2d Cir.2009). Similar to the invocation of a standard FOIA exemption, "[a]n agency 'resisting disclosure' of the requested records has the burden of proving the applicability of an exemption. The agency may meet its burden by submitting a detailed affidavit showing that the information logically falls within the claimed exemptions.' " *Wilner*, 592 F.3d at 68 (quoting *Minier v. C.I.A.*, 88 F.3d 796, 800 (9th Cir.1996)). In evaluating the agency's affidavits, a court "must accord 'substantial weight' to the agency's affidavits, 'provided [that] the justifications for nondisclosure are not controverted by contrary evidence in the record or by evidence of . . . bad faith.' " *Id.* (quoting *Minier*, 88 F.3d at 800). Here, the CIA asserts Exemptions 3 and 1 in connection with its *Glomar* response.

#### i. *Exemption 3*

■ Similar to its response to the bulk of Plaintiffs' requests, the CIA claims that Exemption 3 justifies the CIA's non-response concerning Categories 5–6, 9–10, and 15–17.

#### a. *Categories 5–6 and 9–10*

Categories 5–6 and 9–10 of the Specific FOIA Request seek

5. The cables between the Deputy Director of Operations (or other agency official(s)) at the CIA and the operative(s) in the field discussing and/or approving the use of a slap on detainee Abu Zubaydah (Zein al Abideen Mohamed Hussein).

6. The cables between the Deputy Director of Operations at the CIA (or other agency official(s)) and the operative(s) in the field discussing and/or approving the use of a slap on detainee Khalid Sheikh Mohammed.

\*　　\*　　\*

9. The cables between the Deputy Director of Operations at the CIA (or other agency official(s)) to the operative(s) in the field discussing and/or approving the use of sleep deprivation on Abu Zubaydah.

10. The cables between the Deputy Director of Operations at the CIA (or other agency official(s)) and the operative(s) in the field discussing and/or approving the use of sleep deprivation on Khalid Sheikh Mohammed.

(Specific FOIA Request at 3–4.) As set forth in the Hilton Declaration, the information in Categories 5–6 and 9–10 is "protected from disclosure under [Exemption 3] because it would reveal intelligence sources and methods protected by the NSA . . . ." (Hilton Decl. ¶ 237.) Responding to those categories "would reveal details regarding the CIA's detention and interrogation program and whether or not the CIA used certain specified methods to interrogate certain individuals." (*Id.* ¶ 238.) "The disclosure of such information regarding intelligence methods is unauthorized under the NSA because the DNI has specifically found that this information must be protected from disclosure in the interest of national security." (*Id.* ¶ 239.)

Having already determined that the Hilton Declaration was made in good faith, the Court must determine whether Ms. Hilton's justifications are not "controverted by contrary evidence." *Wilner*, 592 F.3d at 68. Plaintiffs, though, do not offer contradictory evidence; rather, they argue that because much of the information is already in the public domain through various memoranda (*see* Pl. Mem. at 27–31), acknowledging the existence of the requested cables cannot possibly harm national security since the information is already public knowledge. This argument, though, is insufficient to challenge the CIA's affidavits because nothing in these

public disclosures contradicts Hilton's conclusions that the release of the information would be detrimental to national security.

In the alternative, Plaintiffs argue that the official disclosures through various memoranda amount to a waiver of the CIA's right to invoke a *Glomar* response. The official memoranda that Plaintiffs claim require a finding of waiver include: the May 30, 2005 Art. 16 Techniques Memo, the OIG's Special Review, and the Memorandum from Jay S. Bybee, Assistant Attorney General, Office of Legal Counsel, Department of Justice to John Rizzo, Acting General Counsel, C.I.A., Interrogation of al Qaeda Operative (Aug. 1, 2002) (Satterthwaite Decl., Ex. QQ ("Aug. 1, 2002 Zubaydah Memo")). In sum, Plaintiffs claim that the aforementioned memoranda officially disclose that the CIA authorized the use of EITs, including the use of sleep deprivation, insult slaps, and waterboarding, on both Abu Zubaydah and Khalid Sheikh Mohammed. (*See* Aug. 1, 2002 Zubaydah Memo at 3; May 30, 2005 Art. 16 Techniques Memo at 9, 37; OIG Special Review at 90–91.) Therefore, Plaintiffs contend, because it is publicly known that the specific EITs were used, it necessarily follows that documents must exist authorizing the use of those EITs. Plaintiffs' interpretation of these official disclosures, though, goes too far. Simply because the government has generally acknowledged the use of EITs does not mean that Plaintiffs are entitled to specific operational wires used during the interrogations of Zubaydah and Sheikh Mohammed.

As discussed above, "[a]n agency's official acknowledgment of information by prior disclosure ... cannot be based on mere public speculation, no matter how widespread." *Wolf v. C.I.A.,* 473 F.3d 370, 378 (D.C.Cir.2007). Instead, an official acknowledgment must meet three criteria:

First, the information requested must be as specific as the information previously released. Second, the information requested must match the information previously disclosed .... Third, ... the information requested must already have been made public through an official and documented disclosure.

*Fitzgibbon,* 911 F.2d at 765. "Prior disclosure of similar information does not suffice; instead, the *specific* information sought by the plaintiff must already be in the public domain by official disclosure." *Wolf,* 473 F.3d at 378. "The insistence on exactitude recognizes 'the Government's vital interest in information relating to national security and foreign affairs.'" *Id.* at 378 (quoting *Public Citizen v. Dep't of State,* 11 F.3d 198, 203 (D.C.Cir.1993)). Here, the official disclosures via the three memoranda are nothing more than general acknowledgments that the CIA used some EITs during the interrogations of Zubaydah and Sheikh Mohammed. A general acknowledgment, though, is not equivalent to "*specific* information sought." *Id.* at 378. "An agency only loses its ability to provide a *Glomar* response when the existence or nonexistence of the particular records covered by the *Glomar* has been officially and publicly disclosed." *Wilner,* 592 F.3d at 70. Here, the public disclosures never acknowledge the existence or nonexistence of operational cables relating to the approval of the use of EITs as to Zubaydah or Sheikh Mohammed. *See Wolf,* 473 F.3d at 379 ("In the *Glomar* context, then, the prior disclosure establishes the *existence* (or not) of records responsive to the FOIA request, the prior disclosure necessarily matches both the information at issue—the existence of records—and the specific request for that information."). Therefore, because the official disclosures do not match the information Plaintiffs seek, the Court finds that the CIA did not

waive its right to invoke a *Glomar* response as to Categories 5–6 and 9–10.

### b. *Categories 15–17*

With respect to Categories 15–17, Plaintiffs seek records concerning

15. The communications between the CIA and the U.S. Embassy in Sana'a, Yemen, relating to the apprehension, transfer and/or detention of Mohamed Farag Ahmad Bashmilah (Muhammad Bashmilah). These communications likely occurred on or around March 5, 2005, and were preparatory to a communication between the U.S. Embassy in Sana'a and the Government of Yemen that has been acknowledged by the Government of Yemen.

16. The communications between the U.S. Government and the Government of Yemen, and/or any documents pertaining to the transfer of Mohamed Farag Ahmad Bashmilah from U.S. custody to the custody of the Government of Yemen on or near May 5, 2005. The Government of Yemen has acknowledged the existence of communications between the U.S. Government and the Government of Yemen concerning Mr. Bashmilah's transfer.

17. A copy of the files relating to Salah Nasser Salim All and Mohamed Farag Ahmad Bashmilah provided to the Government of Yemen on Nov. 10, 2005 by the United States Government. The Government of Yemen has acknowledged the existence of these files.

(Specific FOIA Request at 4–5.) Again, the CIA again claims that acknowledging the existence or nonexistence of these records would reveal intelligence sources and methods. (Def. Mem. at 33.) In fact, the CIA claims that if it is required to respond to these requests, it would

confirm or deny several facts: whether the CIA was involved or had an interest in the capture, transfer, and detention of Bashmilah; whether the CIA communicated with the U.S. Embassy in Yemen on this matter; whether Bashmilah was ever in U.S. custody; whether Bashmilah was transferred from the custody of the U.S. Government to the Government of Yemen; whether the U.S. Government was in communication with the Government of Yemen regarding the custody transfer of Bashmilah; whether the CIA and/or the U.S. Government generally had collected information on Bashmilah and Ali; and whether the U.S. Government shared such information on these two individuals with the Government of Yemen.

(Hilton Decl. ¶ 245.) This information implicates the use of "foreign liaison relationships," a particular intelligence method. (*Id.* ¶ 246.) Additionally, confirming or denying the existence of records concerning Bashmilah or Ali would "reveal whether [the CIA] had an interest in them related to the CIA's ongoing intelligence gathering function and the CIA's capabilities regarding such a collection." (*Id.* ¶ 248.)

Plaintiffs, again, do not contradict Hilton's conclusions with contrary evidence but rather rely on the fact that because "the Yemeni authorities publicly disclosed the relationship" the CIA's *Glomar* response is rendered moot. (Pl. Mem. at 32.) For the same reasons discussed above, however, an official disclosure by the Yemeni government is not equivalent to an official disclosure by the CIA. *Cf. Frugone v. C.I.A.*, 169 F.3d 772, 775 (D.C.Cir.1999) (finding that a public acknowledgement by the Office of Personnel Management of a relationship between purported a former employee of the CIA and the CIA did not impact the CIA's right to invoke FOIA exemptions because the CIA should not be "required either to

confirm or to deny statements made by another agency"). Accordingly, because these records have never been officially acknowledged by the CIA, the "confirmation or denial of the existence or records responsive to these categories would result in the unauthorized disclosure of intelligence sources and methods[; s]uch a disclosure is protected under the [NSA] and the CIA Act and thus exempt under FOIA Exemption [3]." (Hilton Decl. ¶ 224)

### ii. *Exemption 1*

 Similar to its substantive assertion of Exemption 1, the CIA relies on Exec. Order No. 12,958 to support its *Glomar* responses to Categories 5–6, 9–10, and 15–17.

Exec. Order No. 12,958 instructs the CIA to "refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their existence or nonexistence is itself under this order or its predecessors." (Exec. Order No. 12,958 § 3.6(a).) The CIA invokes Exemption 1 with respect to these records because acknowledging the existence of these records "(1) would necessarily reveal properly classified information regarding intelligence activities, sources, and methods, or foreign relations or activities; and (2) could reasonably be expected to cause at least serious damage to the national security." (Def. Mem. at 34) (citing Hilton Decl. ¶¶ 223, 225, 231–35, 240–42, 250–53.) With respect to the first prong, the Court has already addressed how acknowledgment of the information would reveal intelligence sources and methods and could also reveal intelligence activities, foreign relations, or foreign activities. (*See supra* III.B.) With respect to the second prong, Ms. Hilton has stated that the information revealed through an official acknowledgment of the existence of documents could reasonably be expected to damage the national security because:

Responding to Categories 5–6, and 9–10 could give terrorists insights into the "strategy and methods used by the United States when conducting any sort of interrogation, including those under the Army Field Manual" and allow them to train to evade interrogation. (Def. Mem. at 35 (quoting Hilton Decl. ¶ 240).)

Responding to Categories 15–17 could (1) "provide to foreign intelligence services and other hostile entities valuable information regarding the extent of the CIA's liaison relationship generally and with respect to these individuals," (2) "weaken, or even sever, the relationship between the CIA and its foreign partners, degrading the CIA's ability to combat terrorism," and (3) "provide foreign intelligence services or other hostile entities with information concerning the reach of the CIA's intelligence monitoring." (*Id.* (quoting Hilton Decl. ¶¶ 250–51, 254).)

The Court finds the CIA's declarations to be sufficiently detailed in summarizing the potential harm to national security should the records become public. Plaintiffs failed to point to any evidence that contradicts Ms. Hilton's findings; instead, Plaintiffs rely on the limited, official disclosures, which, as the Court addressed above, do not demonstrate how the release of the withheld information would not pose a threat to national security. (*See generally,* Pl. Mem. at 27–33.) For the reasons set for the above, the Court finds that the public disclosures do not amount to a waiver nor do they in any way diminish the harm to national security should the information become public. Accordingly, the Court finds the CIA's assertion of *Glomar* responses with respect to Categories 5–6, 9–10, and 15–17 are proper pursuant to Exemption 1.

## D. Remaining Exemptions

### i. Exemption 2

 Under FOIA Exemption 2, 5 U.S.C. § 552(b)(2), the Government may withhold from disclosure records "related solely to the internal personnel rules and practices of an agency." Such information concerns "those rules and practices that affect the internal workings of an agency [,] and, therefore, would be of no genuine public interest." *Massey v. F.B.I.*, 3 F.3d 620, 622 (2d Cir.1993) (internal quotations omitted). "Such internal agency information may be withheld if it is of no genuine public interest or [ ] if the material is of public interest [ ] and the government demonstrates that disclosure of the material would risk circumvention of lawful agency regulations." *Id.* (internal quotations omitted).

 The CIA claims that Exemption 2 covers various records including "NCS's administrative, routing, and handling notations, which reflect the internal workings of the NCS and are routine matters of merely internal interest." (Def. Mem. at 58.) However, in support of this exemption, the CIA merely offers one conclusory paragraph in the Hilton Declaration asserting that "low 2" information is being withheld. (Hilton Decl. ¶ 167.) In addition, the CIA claims that the descriptions contained in the *Vaughn* index provide further justification for the Exemption 2 withholdings. (Def. Reply at 38.) The Court finds the CIA's justifications to be wanting. The CIA cites *James Madison Project v. C.I.A.*, 607 F.Supp.2d 109 (D.D.C.2009), for the proposition that "[t]he withholding of the type of trivial administrative information at issue in these documents is routinely upheld by courts." (Def. Reply at 38.) However, in *James Madison Project*, the CIA provided

an affidavit wherein the affiant set forth in several paragraphs describing document by document why the information was withheld pursuant to Exemption 2. *James Madison Project*, 607 F.Supp.2d at 125, The Court finds no such detail in Ms. Hilton's Declaration. Accordingly, the Court finds that the CIA has not met its burden with respect to the documents withheld under Exemption 2.

Regardless of the Court's finding, however, most, if not all, of the documents withheld under Exemption 2 were also withheld under Exemptions 1 or 3.[10] Therefore, although Exemption 2 is an insufficient basis to withhold the documents, the records are still covered by Exemptions 1 and 3.

### ii. Exemption 5

Under FOIA Exemption 5, 5 U.S.C. § 552(b)(5), the Government may withhold from disclosure any "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." "Stated simply, agency documents which would not be obtainable by a private litigant in an action against the agency under normal discovery rules (*e.g.*, attorney-client, work-product, executive privilege) are protected from disclosure under Exemption 5." *Tigue v. U.S. Dep't of Justice*, 312 F.3d 70, 76 (2d Cir.2002) (quoting *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 481 (2d Cir.1999)). "While 'intra-agency' documents are those that remain inside a single agency, and 'inter-agency' documents are those that go from one governmental agency to another, they are treated identically by courts interpreting FOIA." *Id.* at 77; *see Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 188, 95 S.Ct. 1491, 44

**10.** Documents 174 and 249 of the *Vaughn* index were withheld pursuant to Exemptions 6 and 7; therefore, for the reasons set forth

*infra* the documents should still not be disclosed.

L.Ed.2d 57 (1975) ("Exemption 5 does not distinguish between inter-agency and intra-agency memoranda."). Here, the CIA has withheld documents, in whole or in part, under the deliberative process privilege, the attorney-client privilege, the attorney work product doctrine, the presidential communication privilege, and the privilege protecting witness statements to OIG investigators.

### a. *Deliberative Process Privilege*

 To qualify for the deliberative process privilege under Exemption 5, "a document must be both 'predecisional' and 'deliberative.'" *Grand Cent. P'ship, Inc.*, 166 F.3d at 482 (citing *Renegotiation Bd.*, 421 U.S. at 184, 95 S.Ct. 1491). A record is considered "predecisional" if it "precedes, in temporal sequence, the 'decision' to which it relates," *see id.*, however the agency need not "point to a specific decision made by the [agency] in reliance on [record] … [so long as the record] was prepared to assist [the agency] decision-making on a specific issue," *Tigue*, 312 F.3d at 80. A document is "deliberative" when it is "'actually … related to the process by which policies are formulated.'" *Grand Cent. P'ship, Inc.*, 166 F.3d at 482 (quoting *Hopkins v. U.S. Dep't Hous. and Urban Dev.*, 929 F.2d 81, 84 (2d Cir.1991)). In considering whether a document is deliberative, courts consider whether the document "(i) formed an essential link in a specified consultative process, (ii) reflect[s] the personal opinions of the writer rather than the policy of the agency, and (iii) if released, would inaccurately reflect or prematurely disclose the views of the agency." *Id.* (internal citations and quotation marks omitted). Additionally, purely factual matters are not within the ambit of the privilege. *See Hopkins*, 929 F.2d at 84.

According to the CIA, the vast majority of the documents for which the deliberative process privilege is claimed are predecisional recommendations and proposals, *see, e.g.*, Hilton Decl., Ex. A (Documents 3, 98, 101, 111, 113, 142); legal advice, *see, e.g., id.* (Documents 41, 51, 67, 69); talking points and briefing papers, *see, e.g., id.* (Documents 96, 120); and records reflecting internal discussions regarding policy issues that were under consideration within the Executive Branch, *see, e.g.*, Hilton Decl. ¶ 184, Ex. A (Documents 37, 42, 47, 100, 110, 123); [Grafeld Decl.], ¶¶ 11–17 (Document 103); [Hackett Decl.], ¶¶ 12–21 (Documents 3, 4, 62, 103–104, 107–111, 130 and 243); [Stearns Decl.], ¶¶ 9, 11–12 (Document 284); [Hecker Decl.], ¶¶ 4–5, 11–12 (Documents 103, 192).

(Def. Mem. at 39–40.) Plaintiffs attack the CIA's assertion of the deliberative process privilege on several grounds including: (1) records fail the intra- or inter-agency requirement; (2) insufficient declarations and *Vaughn* index to establish the privilege; and (3) unwarranted reliance on "draft status" to justify withholdings. (Pl. Mem. at 34–36.) Each of Plaintiffs' arguments will be discussed in turn.

### 1. *Intra- or Inter-agency Requirement*

 Plaintiffs argue that some of the documents fail the intra- or inter-agency requirement because the documents either were sent to or sent from a member of Congress. Specifically, Plaintiffs assert that documents 66, 79, and 96 do not fall within the requirements of Exemption 5 because "members of Congress are *not* within the definition of 'agency.'" (Pl. Mem. at 34.) Although some of Plaintiffs' arguments are meritorious, any documents that fail to meet the requirements of Exemption 5 are nonetheless properly withheld under Exemptions 1 or 3.

First, Document 79 is a letter from a member of Congress to the DNI. (Hilton

Decl., Ex. A.) It is clear from the *Vaughn* index description that Exemption 5 is invoked not to withhold the letter itself (which is withheld pursuant to Exemptions 1 and 3), but to withhold the handwritten notes from the reviewing official who was commenting on the letter received from the member of Congress. Such analysis clearly " '[reflects] advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated,' " and thus is properly withheld. *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 150, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975) (quoting *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318, 324 (D.D.C. 1966)).

It is unclear from the declarations and *Vaughn* index entries, however, why the portions withheld in Documents 66 and 96 satisfy the requirements of Exemption 5. With respect to these Documents, while the information might otherwise fit the deliberative process privilege, both documents do not satisfy the inter-agency requirement. (*See* Document 66 (from foreign liaison to CIA attorney); Document 96 (from CIA Executive Director to Member of Congress).) Exemption 5, standing alone, could not protect the disclosure of these deliberations. *See Dow Jones & Co. v. U.S. Dep't of Justice*, 917 F.2d 571, 574 (D.C.Cir.1990) (concluding that Exemption 5 did not cover communications between executive branch and Congress). Nevertheless, the contents of the two contested Documents are properly withheld pursuant to Exemptions 1 and 3.

### 2. *Insufficient Declarations*

Plaintiffs maintain that both the *Vaughn* index descriptions and declarations in support of the CIA's use of Exemption 5 "do not adequately demonstrate that the records are 'deliberative' because they fail to provide meaningful identification of 'the deliberative process involved and the role played by each document in the course of that process.' " (Pl. Mem. at 35 (quoting *Greenberg v. U.S. Dep't of Treasury*, 10 F.Supp.2d 3, 16 (D.D.C.1998)).) Moreover, Plaintiffs contend that "numerous entries fail to show that the withheld records are 'predecisional' or 'prepared in order to assist an agency decisionmaker in arriving at his decision.' " (Pl. Mem. at 35 (quoting *Grand Cent. P'ship, Inc.*, 166 F.3d at 482).) The CIA argues that "given the classified nature of the documents at issue, [ ] the Government is unable to provide extensive details regarding the specific nature of the policy issues under consideration on the public record." (Def. Reply at 28.)

The Court may "grant summary judgment in favor of an agency on the basis of agency affidavits [alone] if they contain reasonable specificity of detail rather than merely conclusory statements." *Grand Cent. P'ship, Inc.*, 166 F.3d at 478 (internal quotation omitted). Thus, the declarations must, at the very least, establish a logical connection between the information withheld and the exemption claimed. *See, e.g., American–Arab Anti–Discrimination Comm. v. U.S. Dep't of Homeland Sec.*, 516 F.Supp.2d 83, 86 (D.D.C.2007); *Berger v. I.R.S.*, 487 F.Supp.2d 482, 492–92 (D.N.J.2007), *aff'd*, 288 Fed.Appx. 829 (3d Cir.2008), *cert. denied*, —— U.S. ——, 129 S.Ct. 2789, 174 L.Ed.2d 290 (2009); *Amro v. U.S. Customs Serv.*, 128 F.Supp.2d 776, 782 (E.D.Pa.2001). The requirement of reasonable specificity

> forces the government to analyze carefully any material withheld, it enables the trial court to fulfill its duty of ruling on the applicability of the exemption, and it enables the adversary system to operate by giving the requester as much information as possible, on the basis of which he can present his case to the trial court.

*Judicial Watch v. F.D.A.*, 449 F.3d 141, 146 (D.C.Cir.2006) (quoting *Keys v. U.S. Dep't of Justice*, 830 F.2d 337, 349 (D.C.Cir.1987)). Once the adequacy of the Government's affidavits is established, they benefit from a presumption of good faith, which "cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *Grand Cent. P'ship, Inc.*, 166 F.3d at 489 (internal quotation marks omitted).

An "agency need not pinpoint a particular final decision to which the material contributed." *Greenberg v. U.S. Dep't of Treasury*, 10 F.Supp.2d 3, 16 n. 18. (D.D.C.1998). Here, the Court is cognizant of the fact that in cases of national security the CIA tends to be "very vague when it discusses [ ] the decisions at issue [;] the *Vaughn* index usually just says that the materials were used 'in arriving at a decision.' " *Id.* While the Court normally would order a party to produce more specific information concerning a particular decision, it is clear in this case "that the CIA is concerned that any further information about the decisions would threaten national security." *Id.* "Agency affidavits are entitled to 'substantial weight' in national security cases when they aver that identified documents are exempt." *Id.* (quoting *Goland v. C.I.A.*, 607 F.2d 339, 350 (D.C.Cir.1978)).

The Court finds that the *Vaughn* index entries coupled with the declarations offered in support of the CIA's withholdings provide the Court with sufficient detail to determine that the records were withheld properly pursuant to Exemption 5. The declarations and *Vaughn* index entries detail how the withheld documents were "prepared to assist [agency] decisionmaking on [ ] specific issue[s]." *Tigue*, 312 F.3d 70, 80 (2d Cir.2002). The documents are not "merely peripheral to actual policy formation" but rather "bear on the formulation or exercise of policy-oriented judg-ment." *Id.* (quoting *Grand Cent. P'ship, Inc.*, 166 F.3d at 482).

### 3. *Draft Status*

Lastly, Plaintiffs complain that the CIA "improperly relies on the 'draft' status of documents as grounds to withhold them." (Pl. Mem. at 36–37.) It is well-settled that "[d]raft documents, by their very nature, are typically predecisional and deliberative. They reflect only the tentative view of their authors; views that might be altered or rejected upon further deliberation either by their authors or by superiors." *Exxon Corp. v. U.S. Dep't of Energy*, 585 F.Supp. 690, 698 (D.D.C.1983) (internal quotation marks and citation omitted); *see also Nat'l Council of La Raza v. U.S. Dep't of Justice*, 339 F.Supp.2d 572, 573 (S.D.N.Y.2004) ("Drafts and comments on documents are quintessentially predecisional and deliberative."). The draft status alone, however, does not lead to a per se exemption. Rather, the declarations and *Vaughn* index entries must demonstrate that "the drafts 'formed an essential link in a specified consultative process' or 'if released, would inaccurately reflect or prematurely disclose the views of the agency.' " *N.Y. Times Co. v. U.S. Dep't of Def.*, 499 F.Supp.2d 501, 515 (S.D.N.Y. 2007) (quoting *Grand Cent. P'ship, Inc.*, 166 F.3d at 482).

The Court finds that the CIA has provided the Court with sufficient information, in the form of supporting declarations (*see* Barron Decl., Grafeld Decl., and Hecker Decl.) and the descriptions contained in the *Vaughn* index, to support the CIA's withholding of documents pursuant to the deliberative process privilege.

### b. *Attorney–Client and Work–Product Privileges*

### 1. *Attorney–Client Privilege*

■■■■■ "The broad outlines of the attorney-client privilege are clear: (1) where

legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived." *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of Am., AFL–CIO,* 119 F.3d 210, 214 (2d Cir.1997) (citation and internal quotation marks omitted). "The purpose of the attorney-client privilege is to promote open communication between attorneys and their clients so that fully informed legal advice may be given." *In re John Doe, Inc.,* 13 F.3d 633, 635–36 (2d Cir.1994). "[T]he traditional rationale for the privilege applies with special force in the government context," *In re Grand Jury Investig.,* 399 F.3d 527, 534 (2d Cir. 2005), because public officials need "candid legal advice" to "understand and respect constitutional, judicial and statutory limitations," *In re County of Erie,* 473 F.3d 413, 419 (2d Cir.2007). The burden is on the agency to demonstrate that confidentiality was expected in the handling of these communications and that it was reasonably careful to keep this confidential information protected from general disclosure. *Coastal States Gas Corp. v. U.S. Dep't of Energy,* 617 F.2d 854, 863 (D.C.Cir.1980). "In the governmental context, the 'client' may be the agency and the attorney may be an agency lawyer." *Tax Analysts v. I.R.S.,* 117 F.3d 607, 618 (D.C.Cir.1997). To prevail on its attorney-client privilege claim, therefore, an agency must establish that the information conveyed formed part of a confidential communication to or by an attorney in the course of a professional relationship. *See Mead Data Cent., Inc. v. U.S. Dep't of Air Force,* 566 F.2d 242, 253 (D.C.Cir.1977).

FOIA Exemption 5 protects a broad range of communications between agency staff and their attorneys. *See Upjohn Co. v. United States,* 449 U.S. 383, 392–97, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). The attorney-client privilege under Exemption 5 protects the communications of both agency decision-makers and lower echelon agency employees and their lawyers. *See id.* Because those agency employees who do not have the ultimate authority to determine policy still might possess information that is useful to the agency's attorney, the Supreme Court has extended FOIA protection to their communications with agency lawyers. *See id.* The *Upjohn* Court also stated that Exemption 5 protects the specifics of attorney-client communications even when the subject matter of the communications is already known to third parties. *See id.* at 395–96, 101 S.Ct. 677. Much like the requirements for a privilege log in civil litigation, there are several requirements that must be met in a *Vaughn* index if this Court is to uphold the non-disclosure of documents pursuant Exemption 5 to the attorney-client privilege. *See Dir. of the Office of Thrift Supervision v. Ernst & Young,* 795 F.Supp. 7, 11 (D.D.C.1992). Importantly, among other things, a privilege log must "state the subject matter, number of pages, author, date created, and the identities of all persons to whom the original or any copies of the document were shown or provided." *Id.*

*Hornbeck Offshore Transp., LLC v. U.S. Coast Guard,* No. Civ.A. 04–1724, 2006 WL 696053, at *14 (D.D.C. Mar. 20, 2006).

■ Here, the CIA argues that documents reflecting communications to, from or among attorneys with the CIA's OGC, which reflect the legal advice, analysis or opinions provided by those attorneys to its client, the CIA, have properly been withheld under the attorney-client privilege. (*See* Hilton Decl. ¶ 178; Ex. A (Documents 29, 33, 34, 41, 43, 44, 49, 51, 53, 66,

67, 69, 72, 76, 81–84, 102–03, 137, 148, 176, 177, 184, 191–92, 194, 199, 220, 263); *see also* Hecker Decl. at ¶¶ 13–16 (Department of Defense legal advice contained in Documents 20, 103, and 192); Grafeld Decl. ¶¶ 9, 15, 20 (State Department legal advice contained in Documents 103 and 82).) The CIA maintains that the "documents were prepared . . . with the joint expectation . . . that they would be held in confidence. Moreover, these documents have been held in confidence, except insofar as there are limited quotations from these letters in OLC memoranda that have been released in this litigation." (Hilton Decl. ¶ 178.) Plaintiffs argue, however, that (1) the CIA's declarations do not sufficiently demonstrate how confidentiality was maintained either during or after the communications were made, (Pl. Mem. at 38.), and (2) the *Vaughn* index descriptions do not adequately identify "the source of the CIA's facts" which would permit the invocation of the attorney-client privilege, (*id.* at 41). Moreover, Plaintiffs take the position that the CIA has waived its attorney-client privilege with respect to certain documents because the legal opinions contained in those memoranda were incorporated into other memoranda that were released to the public. (*Id.* at 39.)

Upon reviewing the *Vaughn* index, the Court agrees with Plaintiffs that many of the descriptions are conclusory and lack sufficient detail to merit withholding. (*See, e.g.*, Hilton Decl., Ex. A Document 44 ("In addition, the document contains legal advice and analysis and is therefore withheld pursuant to the attorney-client privilege.").) These descriptions are wholly devoid of any pertinent information that could assist the Court in determining whether the records satisfy the factors set forth above. Specifically, the *Vaughn* index descriptions for Documents 16, 20, 29, 33, 34, 41, 43, 44, 53, 56, 66, 67, 84, 103, 137, 148, 192, 199, 220, 263, and 284 are insufficient with respect to the claims of attorney-client privilege.[11] However, the Hecker Declaration provides enough information to justify the withholding of Documents 20, 103, and 192 (*see* Hecker Decl. ¶¶ 13–16), and the Grafeld Declaration provides enough information to justify the withholding of Documents 82 and 103 (*see* Grafeld Decl. ¶¶ 15, 20). The Court finds the *Vaughn* index descriptions for Documents 8, 10, 11, 18, 49, 51, 69, 72, 76, 81, 82, 176, 177, 184, 191, 194 show that these documents reflect confidential communications or legal advice and are therefore properly withheld pursuant to the attorney-client privilege.

The Court notes, however, that Documents 29, 33, 34, 41, 44, 53, 56, 66, 84, 137, 148, 220, 263, and 284 are properly withheld under other FOIA exemptions (most commonly Exemptions 1 and 3). Accordingly, because the information is exempt pursuant to Exemptions 1 and 3, the CIA is not required to produce these documents, despite the deficient *Vaughn* index entries. Lastly, with respect to Documents 16, 43, and 67, it is unclear from the *Vaughn* index entries which portions of these records may be released and which portions are still properly withheld pursuant to other FOIA Exemptions. (*See* Hilton Decl., Ex. A Documents 16, 43, and 67 (indicating that the records are only withheld in part pursuant to Exemptions 1 and 3).) It would be premature to order the release of these documents because Plaintiffs have not shown that the nondisclosure

---

**11.** The Court notes that when the CIA filed its Reply brief, it submitted revised *Vaughn* index entries for several documents. (*See* Second Hilton Decl., Ex. C.) However, the Court finds that the revised index entries for these documents contain the same, vague descriptions with respect to the attorney-client privilege that were in the original *Vaughn* index.

was improper; rather, Plaintiffs have only pointed to the fact that the record is not sufficiently developed to grant summary judgment. Therefore, for Documents 16, 43, and 67, the CIA is directed to provide an updated *Vaughn* index "with proper detailed document descriptions and reasons for withholding that illuminate the contents of the documents and the reasons for nondisclosure." *Hornbeck Offshore Transp., LLC v. U.S. Coast Guard*, No. Civ.A. 04–1724, 2006 WL 696053, at *22 (D.D.C. Mar. 20, 2006).

### i. *Waiver*

The Court rejects Plaintiffs' argument that the CIA has waived its right to invoke the attorney-client privilege with respect to certain documents due to the release of "limited quotations from these [documents] in OLC memoranda that have been released in this litigation." (Hilton Decl. ¶ 178.) Specifically, Plaintiffs argue that the CIA cannot claim attorney-client privilege over Documents 76 and 81 because portions of those letters were "quoted in the released OLC memoranda, for which attorney-client privilege is claimed." (Pl. Mem. at 39.) Even assuming Plaintiffs are correct, which the Court does not, the possible waiver would have no practical impact on the release of either Document 76 or 81 because, as discussed above, both Documents are withheld i n their entirety pursuant to Exemptions 1 and 3.

### 2. *Attorney Work–Product Privilege*

 The attorney work product doctrine protects "the files and the mental impressions of an attorney … reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways" prepared in anticipation of litigation. *Hickman v. Taylor*, 329 U.S. 495, 510–11, 67 S.Ct. 385, 91 L.Ed. 451 (1947). "Although factual materials falling within the scope of attorney work-product may generally be discovered upon a showing of 'substantial need' under [Fed.R.Civ.P.] 26(b)(3), under [E]xemption 5 the test is whether information 'would routinely be disclosed in private litigation'" to any party. *A. Michael's Piano, Inc. v. F.T.C.*, 18 F.3d 138, 146 (2d Cir.1994) (citing *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 n. 16, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975)). The formulation of the work-product rule used by the Wright & Miller treatise, and cited by the Third, Fourth, Seventh, Eighth and D.C. Circuits, is that "[D]ocuments should be deemed prepared in 'anticipation of litigation,' and thus within the scope of the Rule, if 'in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because* of the prospect of litigation.'" *United States v. Adlman*, 134 F.3d 1194, 1202 (2d Cir.1998) (quoting 8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2024 (3d ed. 1994) (emphasis added)).

The CIA has withheld portions of Documents 32, 33, 34, 43, 49, 51, 53, 56, 66, 67, 69, 72, 76, 81, 82, 83, 84, 102, 284, and 300 on the grounds that the documents were "prepared by attorneys in contemplation of potential litigation and/or administrative proceedings." (Hilton Decl., Ex. A (Document 32).) Plaintiffs argue that, similar to the descriptions for documents withheld pursuant to the attorney-client privilege, the *Vaughn* index entries for the CIA's withholdings pursuant to the attorney work-product privilege are also deficient.

With the exception of the *Vaughn* index description for Document 284, the Court finds that the descriptions for the remaining documents withheld pursuant to the attorney work-product privilege are too general to assist the Court in ruling on the merits of the CIA's withholdings. *See Ju-*

*dicial Watch, Inc. v. FDA,* 449 F.3d 141, 147 (D.C.Cir.2006) (finding that while an agency need not repeat itself when its withholdings "implicate the same exemption for similar reasons," it may not simply explain itself by "generalities"). However, because Documents 32, 33, 34, 49, 51, 53, 56, 66, 69, 72, 76, 81, and 84 are withheld in their entirety based on other exemptions (primarily Exemptions 1 and 3), the fact that the CIA's justification for withholding these documents based on the attorney work-product privilege is inadequate proves to be inconsequential. With respect to Documents 16, 67, 82, 102, and 300 the CIA shall submit more detailed *Vaughn* index descriptions explaining why portions of those records should be withheld pursuant to the attorney work-product privilege.

### c. *Presidential Communications Privilege*

■ The presidential communications privilege has been recognized as a "presumptive privilege for Presidential communications" that are "fundamental to the operation of government and inextricably rooted in the separation of powers under the Constitution." *United States v. Nixon,* 418 U.S. 683, 708, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) ("*Nixon I*"). The privilege protects "communications 'in performance of a President's responsibilities,' ... 'of his office,' ... and made 'in the process of shaping policies and making decisions.'" *Nixon v. Adm'r of Gen. Servs.,* 433 U.S. 425, 449, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977) (quoting *Nixon I,* 418 U.S. at 708, 711, 713, 94 S.Ct. 3090). It is justified in part because "[a] President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." *Nixon I,* 418 U.S. at 708, 94 S.Ct. 3090. The presidential communications privilege "covers final and post-decisional materials as well as pre-

deliberative ones." *In re Sealed Case,* 121 F.3d 729, 745 (D.C.Cir.1997); *see also Judicial Watch, Inc. v. Dep't of Justice,* 365 F.3d 1108, 1113–14 (D.C.Cir.2004).

■ In addition to protecting communications directly with the President, the privilege protects communications involving senior presidential advisers, including "both [ ] communications which these advisers solicited and received from others as well as those they authored themselves," in order to ensure that such advisers investigate issues and provide appropriate advice to the President. *In re Sealed Case,* 121 F.3d at 752. Furthermore, the privilege extends to both presidential communications themselves and records memorializing or reflecting such communications. *See Citizens for Responsibility & Ethics ("CREW") v. U.S. Dep't of Homeland Sec.,* No. 06 Civ. 0173, 2008 WL 2872183, at *3 (D.D.C. July 22, 2008) (holding that documents memorializing communications that were solicited and received by the President or his immediate advisers are subject to presidential communications privilege).

■ Here, the CIA invokes the presidential communication privilege to withhold twenty Documents: 3, 4, 14, 17, 24, 29, 32, 62, 98, 100, 103, 104, 107, 108, 109, 110, 111, 130, 152, and 243. After reviewing the *Vaughn* index and the Hilton and Hackett Declarations, the Court finds that all twenty documents reflect or memorialize communications between senior presidential advisers and other United States government officials and are therefore properly withheld. Specifically, the index and declarations set forth in sufficient detail how presidential advisers solicited and received information or recommendations in the course of gathering information related to detainee policies, including the CIA terrorist detention and interrogation program, in connection with decisions, or

potential decisions, to be made by the President. (*See* Hilton Decl. ¶¶ 190–95 (providing reasons why Documents 14, 17, 24, 29, 32, 98, 100, and 152 were withheld); Hackett Decl. ¶¶ 12–17, 24–29 (setting forth reasons why Documents 3–4, 62, 103–104, 107–11, 130, and 243 were withheld); *see also* Second Hilton Decl., Ex. C (Documents 17, 24, 29, and 32).). Accordingly, the Court finds that the CIA's withholding of documents pursuant to the presidential communications privilege was proper.

### iii. *Exemptions 6 and 7(C)*

■■ Exemption 6 exempts from disclosure information from personnel, medical, or other similar files that "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Under Exemption 7(C), the Government may withhold "records or information" that are "compiled for law enforcement purposes" and that "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). "Exemption 7(C) and Exemption 6 are specifically aimed at protecting the privacy of personal information in government records." *Associated Press v. U.S. Dep't of Justice,* No. 06 Civ. 1758, 2007 WL 737476, at *4 (S.D.N.Y. Mar. 7, 2007), *aff'd,* 549 F.3d 62 (2d Cir.2008). Exemption 7(C), which applies only to information contained in law enforcement records, "is more protective of privacy than Exemption 6, because [Exemption 7(C)] applies to any disclosure that 'could reasonably be expected to constitute' an invasion of privacy that is 'unwarranted.'" *Associated Press,* 2007 WL 737476, at *4; *see Associated Press,* 549 F.3d at 65. To determine whether the documents in question "could reasonably be expected to constitute an unwarranted invasion of personal privacy," a court must balance the individual's privacy interest against the public's interest in disclosure. *See U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press,*

489 U.S. 749, 762–763, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989); *Ferguson v. F.B.I.,* 957 F.2d 1059, 1069 (2d Cir.1992). "[I]ndividuals, including government employees and officials, have privacy interests in the dissemination of their names." *Massey v. F.B.I.,* 3 F.3d 620, 624 (2d Cir.1993); *see Associated Press,* 549 F.3d at 65. On the other side of the scale, "[t]he *only* relevant public interest in the FOIA balancing analysis is the extent to which disclosure of the information sought would shed light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to." *Bibles v. Or. Natural Desert Assoc.,* 519 U.S. 355, 355–56, 117 S.Ct. 795, 136 L.Ed.2d 825 (1997) (quotation marks and citations omitted) (emphasis in original); *Associated Press,* 549 F.3d at 66. Thus, "[i]f release of the documents in question would not further the goal of opening agency action to public scrutiny, no public interest is implicated and disclosure is not mandated." *Id.*; *see also Davis v. U.S. Dep't of Justice,* 968 F.2d 1276, 1282 (D.C.Cir.1992) ("[T]he only public interest relevant for purposes of Exemption 7(C) is one that focuses on 'the citizens' right to be informed about what their government is up to.'").

■■ The CIA has withheld 131 Documents under Exemption 6 and 61 Documents under Exemption 7(C). The CIA has withheld the names and email addresses of DOD personnel below the office-director level, or officers below the rank of Colonel; the names of OLC line attorneys, persons interviewed by the CIA OIG, and one detainee; and personal identifying information such as dates of birth, social security numbers, and biographical information. (*See* Def. Mem. at 56.) Plaintiffs argue, once again, that the CIA's declarations provide the Court with "almost no information to allow for the balancing mandated by the Second Circuit where the

privacy interests of government employees are at stake." (Def. Mem. at 48.) Plaintiffs' argument, though, amounts to nothing more than the pot calling the kettle black. In support of their claim that the public interest outweighs any privacy concerns, Plaintiffs have offered the following: "the public interest far outweighs any discernable privacy interest. The public interest in disclosure of negligent or improper government misconduct is acute." (*Id.* at 48–49.) Such conclusory statements provide the Court with little to weigh the public interest against the privacy concerns of the people whose names and other personal information are contained in the withheld records.

Plaintiffs argue that the Court should employ the balancing test set forth by the Court of Appeals in *Perlman v. U.S. Dep't of Justice,* 312 F.3d 100 (2d Cir.2002), *vacated and remanded,* 541 U.S. 970, 124 S.Ct. 1874, 158 L.Ed.2d 464, *aff'd* 380 F.3d 110 (2d Cir.2004). To determine whether identifying information may be withheld pursuant to Exemption 6, the Court must: "(1) determine whether the identifying information is contained in 'personnel and medical files and similar files;' and (2) balance the public need for the information against the individual's privacy interest in order to assess whether disclosure would constitute a clearly unwarranted invasion of personal privacy." *Associated Press v. U.S. Dep't of Def.,* 554 F.3d 274, 291 (2d Cir.2009) (quoting *Wood v. F.B.I.,* 432 F.3d 78, 86 (2d Cir.2005)). The determination of whether Exemption 6 applies requires "balancing an individual's right to privacy against the preservation of FOIA's basic purpose of opening agency action to the light of public scrutiny." *Id.* (citing *U.S. Dep't of Air Force v. Rose,* 425 U.S. 352, 372, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976)). "Only where a privacy interest is implicated does the public interest for which the information will serve become relevant and require a balancing of the competing interests." *Fed. Labor Relations Auth. v. U.S. Dep't of Veterans Affairs,* 958 F.2d 503, 509 (2d Cir.1992). "FOIA requires only a measurable interest in privacy to trigger the application of the disclosure balancing tests." *Id.* at 510. "An invasion of more than a *de minimis* privacy interest protected by Exemption 6 must be shown to be 'clearly unwarranted' in order to prevail over the public interest in disclosure." *Id.* Therefore, under Exemption 6, the CIA's "burden in establishing the required invasion of privacy is heavier than the burden in establishing invasion of privacy under Exemption 7(C)." *Associated Press,* 554 F.3d at 291 (quoting *U.S. Dep't of State v. Ray,* 502 U.S. 164, 172, 112 S.Ct. 541, 116 L.Ed.2d 526 (1991)). "Exemption 6 does not protect against disclosure every incidental invasion of privacy-only such disclosures as constitute 'clearly unwarranted' invasions of personal privacy." *Rose,* 425 U.S. at 382, 96 S.Ct. 1592.

With respect to Exemption 7(C), a similar balancing of interests occurs. The Court must balance the CIA's employee's privacy interests against the public's interest in disclosure and, in doing so, should consider various factors, including:

(1) the government employee's rank; (2) the degree of wrongdoing and strength of evidence against the employee; (3) whether there are other ways to obtain the information; (4) whether the information sought sheds light on a government activity; and (5) whether the information sought is related to job function or is of a personal nature. The factors are not all inclusive, and no one factor is dispositive.

*Perlman,* 312 F.3d at 107. Here, it is clear from the CIA's declarations in support of its motion that, with respect to government personnel, the privacy redactions were of lower-level employees. *See* Hilton Decl. ¶¶ 196–99, 207–10 & Ex. A

(Documents 126, 127, 131, 134–36); Hogan Decl., ¶ 3 ("[I]t is the policy of the [DOD] that it will not release, nor authorize any other federal agency to release, lists of names or other personal identifying information of DOD personnel … [except the DOD] may release the names, official titles [ ], and telephone numbers for personnel at the office director level or above, for military officers above the rank of Colonel (Captain in the Navy), and for those officials below the office director level [whose] positions and duties require frequent interaction with the public."); McGuire Decl., ¶¶ 8–11 (Document 249); Herrington Decl. ¶¶ 7–10 (Document 247); Hecker Decl. ¶¶ 17–20 (Documents 192, 250); Barron Decl. ¶ 14 (Documents 1, 9, 10, 11, and 83).) Moreover, Plaintiffs have presented the Court with no countervailing evidence as to why the public interest outweighs the privacy concerns of the agency employees. With respect to the name of the detainee referenced in Document 24 9, the Court follows the Court of Appeals' analysis in *Associated Press* and finds that the "detainee identifying information contained in records of DOD's investigations of detainee abuse" is "exempt from disclosure under the FOIA privacy exemptions." 554 F.3d at 278–79, 290.

Accordingly, after having weighed the privacy concerns of the individuals whose information appears in the withheld documents against the public's interest in disclosure of alleged government misconduct, the Court finds that the factors weigh in favor of nondisclosure. It is clear from the CIA's declarations that the privacy concerns of releasing the personal information of agency employees is not overridden by any public interest in releasing the information. Plaintiffs have not provided the Court with any paramount public interest concerns, and the Court finds none after searching the record. Therefore, the Court finds that it was proper for the CIA

to withhold the requested information pursuant to Exemptions 6 and 7(C).

#### iv. *Exemption 7*

Finally, the CIA has withheld several records pursuant to Exemption 7 on the grounds that the records were made in connection with open OIG investigations. Exemption 7 allows an agency to withhold

> records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, … (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, [or] (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source ….

5 U.S.C. § 552(A), (C), (D). Each subsection will be discussed in turn.

#### a. *Exemption 7(A)*

"To fit within Exemption 7(A), 'the government must show that (1) a law enforcement proceeding is pending or prospective and (2) release of the information could reasonably be expected to cause some articulable harm.'" *Azmy v. U.S. Dep't of Def.*, 562 F.Supp.2d 590, 605 (S.D.N.Y.2008) (quoting *Manna v. U.S. Dep't of Justice*, 51 F.3d 1158, 1164 (3d Cir.1995)). As set forth in the CIA's briefing, the CIA has "withheld information from the open OIG investigations containing records responsive to Plaintiffs' re-

quests." (Def. Mem. at 49 (citing Hilton Decl. ¶¶ 201–03).) The files "consist of documents OIG investigators have collected or created in the course of their investigations," Hilton Decl. ¶ 201, which are "focused upon specific allegations of potentially unlawful activity, for the purpose of determining if there had been a violation of criminal law," *id.* ¶ 202. Plaintiffs contend that the CIA has not provided sufficient justification for invoking Exemption 7(A). Specifically, Plaintiffs point to the fact that the Hilton Declaration does not identify the subject matter of the OIG investigations and sets forth "generalized assertions and [ ] vague categorical descriptions, both of which are equally abstract and elusive." (Pl. Reply at 36.) The Court disagrees.

First, with respect to whether a law enforcement proceeding is pending or prospective, the Court finds that the Hilton Declaration provides enough information for the Court to determine that a law enforcement proceeding was pending. Because the "exact subject matter of [the] OIG investigations is classified, Hilton Decl. ¶ 202, the Court reviewed the Classified version of the Hilton Declaration and found that the records have been compiled for law enforcement purposes. (*See supra* III.B.i.a for discussion of the standards for *in camera* review of classified declarations.)

Second, with respect to the requirement that the CIA demonstrate that articulable harm would exist should the information concerning the investigation files become public, the Hilton Declaration is more than adequate in detailing the harm. "It is not sufficient for an agency merely to state that disclosure would reveal the focus of an investigation; it must rather demonstrate *how* disclosure would reveal that focus." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1114 (D.C.Cir.2007). The Hilton Declaration makes clear that "[p]rocessing documents in the OIG's open investigatory files would interfere with those investigations because it might alert CIA components and individuals that they are under investigation." (Hilton Decl. ¶ 203.)

> The OIG's investigations are confidential. The confidentiality of the open investigations, among individuals and components within the CIA, is essential to the efficacy of those investigations. In order to process the open OIG investigations, however, OIG would require the assistance of CIA personnel from outside the OIG's office ... in order to review potentially responsive documents, to analyze the applicability of FOIA exemptions, to describe the withheld records for a Vaughn index, and to make litigation decisions regarding the records on behalf of the CIA.
>
> Moreover, in order to review and process FOIA requests, IMS personnel must be able to consult with subject matter experts ....

(*Id.* ¶¶ 203–04.) Moreover, the need to rely on the assistance of non-OIG FOIA personnel, lawyers, and subject matter experts to process the OIG files would inevitably interfere with those investigations:

> In revealing this information to CIA employees outside of OIG, those persons would discover whom and what activities the OIG was investigating and what evidence had been collected, thus revealing the nature, scope, and targets of the OIG investigations. Revealing the nature, scope, and targets of the open OIG investigations to non-OIG personnel at the CIA would compromise the confidentiality of the open OIG investigations and would be reasonably likely to harm the OIG's pending law enforcement investigations.

(*Id.* ¶ 205.)

The disclosure of information pertaining to open OIG investigations "could also rea-

sonably be expected to harm the OIG's pending investigations." (*Id.* ¶ 206.) "The open investigatory files are comprised primarily of: (1) interview documentation (*e.g.*, handwritten notes of interviews and interview reports); (2) correspondence of OIG investigators (*e.g.*, e-mails and letters); (3) evidence collected (*e.g.*, intelligence cables, correspondence, reports); and (4) draft reports and working papers." (*Id.*) "Release of records from each of these categories of files could (a) reveal the course, nature, scope or strategy of an ongoing investigation; (b) prematurely reveal evidence in the ongoing investigation; (c) hinder OIG ability to control or shape the investigation; and (d) reveal investigative trends, emphasis, or targeting schemes." *Id.* Such disclosures, *i.e.*, "the release of information in investigatory files prior to the completion of an actual, contemplated enforcement proceeding," "was precisely the kind of interference that Congress ... want[ed] to protect against." *N.L.R.B. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 247, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978); *see also Local 32B-32J, Serv. Emps. Int'l Union, AFL–CIO v. Gen. Servs. Admin.*, No. 97 Civ. 8509, 1998 WL 726000, at *8–9 (S.D.N.Y. Oct. 15, 1998) (holding 7(A) exempted entirety of an agency inspector general's office's investigatory file, where the file consisted of "notes prepared by agents, memoranda summarizing witness interviews and other investigative activities, documents prepared by other sources (either voluntarily or through compulsion by legal process), and other materials").

Accordingly, because the Court finds that the records concerned an active law enforcement proceeding and that the release of those records would interfere with the investigation, the CIA's motion for summary judgment as to Exemption 7(A) is granted.

### b. *Exemption 7(D)*

■ Under Exemption 7(D), the Government may withhold "records or information" that is (1) "compiled for law enforcement purposes" that (2) "could reasonably be expected to disclose the identity of a confidential source ...." 5 U.S.C. § 552(b)(7)(D). To invoke this exemption, the Government must show not that the document withheld is confidential but that the person who provided the information did so "under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred." *U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 172, 113 S.Ct. 2014, 124 L.Ed.2d 84 (1993). "Where an agency relies on an express assurance of confidentiality ... it must offer probative evidence that the source did in fact receive an express grant of confidentiality ..., such as ... an official's personal knowledge about the source ...." *Dipietro v. Exec. Office for United States Att'ys*, 357 F.Supp.2d 177, 185 (D.D.C.2004) (internal quotation marks and citations omitted).

■ Here, the CIA claims that Exemption 7(D) protects from disclosure the witness statements contained within Documents 126, 131, 133–36, 138–40, 143–46, 149–51, 164–171, 173, 187–88, 193, 230–31, 242, 265–66, 270–73, 275, 278, 281, 282, and 285–98.[12] (*See* Hilton Decl. ¶¶ 211–14; Def. Mem., Addendum.) The statements in those Documents, the CIA claims, were made pursuant to "Office of Inspector General regulations [, which] require the OIG to maintain the confidentiality of the information that is provided to them dur-

---

12. Except for Documents 281, 230, and 281, the CIA has invoked Exemption 5 as well as Exemption 7(D) in withholding the OIG witness statements. (*See* Def. Mem., Addendum.)

ing the course of an investigation." (*Id.* ¶ 213.) Both Exemptions 5 and 7(D) are invoked "to withhold the statements of persons to the [OIG] that were taken in the course of criminal or national security intelligence investigations." (*Id.* ¶ 214.)

The CIA argues that the is sources are "confidential" within the first clause of Exemption 7(D)

> both because CIA's regulations are an express assurance of confidentiality, *see Dep't of Justice v. Landano*, 508 U.S. 165, 172 [113 S.Ct. 2014, 124 L.Ed.2d 84] (1993) ("[A] source is confidential within the meaning of Exemption 7(D) if the source provided information under an express assurance of confidentiality" (quotation marks omitted)); *Ortiz v. Dep't of Health and Human Servs.*, 70 F.3d 729, 733 (2d Cir.1995) (same), and because a witness would understand that his or her statements would be treated confidentially under such a regulation, *cf. Halpern v. F.B.I.*, 181 F.3d 279, 299 (2d Cir.1999); *Henke v. U.S. Dep't of Commerce*, 83 F.3d 1445, 1448–49 (D.C.Cir.1996).

(Def. Mem. at 53–54.) Moreover, the CIA claims that the information provided by the sources is itself exempt from disclosure within the second clause of Exemption 7(D) because "[a]n Inspector General of the federal government agency engages in law enforcement activities within the meaning of FOIA," and the cited witness statements were made in the course of OIG investigations, (*see* Hilton Decl. ¶ 211). *Ortiz*, 70 F.3d at 732–33.

Notwithstanding the reasons to withhold the records pursuant to Exemption 7(D), the CIA also argues that the witness statements should not be disclosed pursuant to Exemption 5 citing the necessity of ensuring "frank and open discussion and hence efficient governmental operations." *United States v. Weber Aircraft Corp.*, 465 U.S. 792, 802, 104 S.Ct. 1488, 79 L.Ed.2d 814

(1984); *see Machin v. Zuckert*, 316 F.2d 336, 339 (D.C.Cir.1963) ("[D]isclosure of investigative reports obtained in large part through promises of confidentiality would hamper the efficient operation of an important Government program and perhaps even ... impair the national security by weakening a branch of the military ...."). As set forth in the Hilton Declaration, "at the time the statements were made, OIG regulations provided that witness statements "will be held in confidence, subject to the other duties of the Office." (Hilton Decl. ¶ 189.)

Plaintiffs challenge the CIA's invocation of Exemptions 5 and 7(D). With respect to Exemption 5, Plaintiffs argue that the *Machin* privilege cannot be used to protect statements given in an investigation conducted by the CIA OIG and the statements were not given under promises of confidentiality because the OIG can disclose the statements "when it deems necessary." (Pl. Mem. at 44.) As for Exemption 7(D), Plaintiffs make the same argument that the CIA's declarations and *Vaughn* index entries are "insufficient to test whether such statements were, in fact, compiled for law enforcement purposes." (*Id.* at 47.) Specifically, Plaintiffs contend that the *Machin* privilege only applies where "promises of confidentiality" were made, but here, the statements were made "where confidentiality could reasonably be inferred." *Machin*, 316 F.2d at 339; Hilton Decl., Ex. A (Documents 126, 131, 134, 135, 138, 139). Therefore, Plaintiffs argue that the CIA cannot invoke either Exemption 5 or Exemption 7(D) to withhold the OIG witness statements.

The Court finds the CIA's declarations in support of its motion, coupled with *Vaughn* index entries, provide sufficient detail to warrant nondisclosure under Exemptions 5 and 7(D). It is clear from the

Hilton Declaration that the witness statements were given with the understanding that the statements would be kept confidential. (*See* Hilton Decl. ¶¶ 188–89; 211–214.) Plaintiffs' claim that Exemption 7(B) protection must be denied because the statements were given when confidentiality was only "reasonably inferred" is unavailing. As the Supreme Court found in *Landano*, "[a] source should be deemed confidential if the source furnished information with the understanding that the FBI would not divulge the communication except to the extent the [agency] thought necessary for law enforcement purposes" because "an exemption so limited that it covered only sources who reasonably could expect total anonymity would be, as a practical matter, no exemption at all." *Landano*, 508 U.S. at 174, 113 S.Ct. 2014. It is clear from the declarations and *Vaughn* index entries that the statements would be kept confidential except to the extent necessary "to fulfill the responsibilities of OIG." (Hilton Decl. ¶ 213.) The OIG's confidentiality caveat, *i.e.*, that statements may be disclosed if deemed necessary, does not vitiate the CIA's right to claim Exemption 7(D) protection over the challenged witness statements.

Similarly, the Court finds that the statements are also protected under the *Machin* privilege. Based on the Hilton Declaration and the *Vaughn* index entries, it is clear that the statements were obtained in connection with an OIG investigation and were made with the understanding that they would be kept confidential. Moreover, Plaintiffs' claims that the *Machin* privilege is "a limited protection for confidential witness statements in air crash safety investigations" is a nonstarter. The privilege has been discussed in other non-air crash safety investigations. *See In re Salomon Bros. Treasury Litig.*, No. 91 Civ. 5471, 1994 WL 62852, at *2 (S.D.N.Y. Feb. 22, 1994) (although finding that the *Machin* privilege did not protect certain documents in securities fraud action, the fact that the privilege was invoked in a non-air crash safety investigation did not affect the analysis). Accordingly, the Court finds that CIA properly invoked Exemptions 5 and 7(D) to withhold the challenged documents.

## IV. *SEGREGABLE INFORMATION*

Finally, to the extent already not discussed, the Court finds that the CIA has shown that it has released all segregable information. The CIA's declarations, coupled with the *Vaughn* index descriptions, provide the Court with enough information to determine that forcing the CIA to reprocess all of the records for the sole purpose of releasing various words and phrases would be a waste of time and resources. Moreover, the law is clear that the reasonable segregation requirement of FOIA does not require the CIA "to commit significant time and resources to a task that would yield a product with little, if any, informational value." *Assassination Archives & Research Ctr. v. C.I.A.*, 177 F.Supp.2d 1, 9 (D.D.C.2001), *aff'd in relevant part*, 334 F.3d 55, 58 n. 3 (D.C.Cir.2003); *see also Doherty v. U.S. Dep't of Justice*, 775 F.2d 49, 53 (2d Cir. 1985) ("The fact that there may be some nonexempt matter in documents which are predominately exempt does not require … the burdensome task of analyzing approximately 300 pages of documents, line-by-line."); *Nat'l Sec. Archive Fund, Inc. v. C.I.A.*, 402 F.Supp.2d 211, 221 (D.D.C. 2005) ("Taken in its entirety, [the CIA] declaration provides sufficient detail of the nature of the classified and other exempt information contained in the document for the Court to conclude that those isolated words or phrase that might not be redacted for release would be meaningless."). Accordingly, the Court finds that, unless otherwise mentioned in this Opinion and

Order, the CIA has released all segregable information.

## CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment [dkt. no. 141] is GRANTED in part and DENIED in part, and Plaintiffs' Cross–Motion for Partial Summary Judgment [dkt. no. 158] is GRANTED in part and DENIED in part as follows:

(1) Defendant's Motion is granted and Plaintiff's Cross–Motion is denied with respect to the adequacy of the search for records pursuant to the CCR FOIA Request and the First and Second AI FOIA Requests. Defendant's Motion and Plaintiffs' Cross–Motion are granted in part and denied in part with respect to the adequacy of the search pursuant to the Specific FOIA Request, The CIA shall conduct a search for records responsive to Categories Seven and Eight using the term "attention grasp."

(2) Defendant's Motion is granted and Plaintiffs' Cross–Motion is denied with respect to its withholding of documents pursuant to Exemptions 1 and 3.

(3) Defendant's Motion is granted and Plaintiffs' Cross–Motion is denied with respect to the CIA's issuance of *Glomar* Responses pursuant to Exemptions 1 and 3.

(4) Defendant's Motion is denied and Plaintiffs' Cross–Motion is granted with respect to records withheld pursuant to Exemption 2. To the extent any records are not withheld in full under other Exemptions, the CIA shall submit more detailed *Vaughn* index descriptions so that the Court may make a determination about the propriety of the withholdings.

(5) Defendant's Motion and Plaintiffs' Cross–Motion are granted in part and denied in part with respect to records withheld pursuant to Exemption 5 as follows:

(a) Defendant's Motion is granted and Plaintiffs' Cross–Motion is denied with respect to Documents withheld pursuant to the deliberative process privilege;

(b) Defendant's Motion and Plaintiffs' Cross–Motion are granted in part and denied in part with respect to the CIA's assertion of the Attorney–Client and Attorney Work–Product privileges. The CIA shall submit more detailed *Vaughn* index descriptions for Documents 16, 43, 67, 82, and 102 explaining the basis of the withholdings based on the privileges so that the Court may make a determination about the propriety of the withholdings; and

(c) Defendant's Motion is granted and Plaintiffs' Cross–Motion is denied with respect to Documents withheld pursuant to the presidential communications privilege.

(6) Defendant's Motion is granted and Plaintiffs' Cross–Motion is denied with respect to Documents withheld pursuant to the Exemptions 6 and 7(C).

(7) Defendant's Motion is granted and Plaintiffs' Cross–Motion is denied with respect to Documents withheld pursuant to Exemption 7(A).

(8) Defendant's Motion is granted and Plaintiffs' Cross–Motion is denied with respect to Documents withheld pursuant to Exemption 7(D) and the *Machin* privilege.

The parties shall confer and inform the Court by letter no later than August 13, 2010 how they propose to proceed.

SO ORDERED.